John McVICKER, Sue DeVore McVicker, W. C. Berry, Robert E. Baker and John T. Gibson, Plaintiffs in Error,

v.

HORN, ROBINSON and NATHAN, a copartnership of Ed Horn, Robert Robinson and Samuel Nathan; J. W. Dutton, S. L. Marshall and Ray Burgin, Defendants in Error.

No. 37716.

Supreme Court of Oklahoma.

Feb. 25, 1958.

Luther Bohanon, Bert Barefoot, Jr., W. Otis Ridings, and Norman E. Reynolds, Jr., Oklahoma City, for plaintiffs in error.

Chas. L. Orr, Oklahoma City, for defendant in error Horn, Robinson and Nathan.

Robinson, Shipp, Robertson & Barnes, by T. Murray Robinson, Wm. L. Robertson, Oklahoma City, Okl., for defendants in error Ray Burgin and S. L. Marshall.

BLACKBIRD, Justice.

Plaintiffs in error, hereinafter referred to as plaintiffs, are the owners of a 40-acre tract of land in the Witcher area of Oklahoma County. In 1953, they executed and delivered to J. W. Dutton an oil and gas lease on said tract for a term of one year. from October 31st, 1953. Dutton thereafter assigned the lease to the partnership of Horn, Robinson and Nathan, reserving to himself, as overriding royalty, $\frac{1}{8}$th of the $\frac{7}{8}$ths lessees' interest therein. Thereafter, he assigned a part of this reserved interest to S. L. Marshall; and Horn, Robinson and Nathan assigned to Ray Burgin a part of their working interest. All of the aforenamed owners of the working, or normal lessee's interest, will hereinafter be collectively referred to as defendants. They completed a gas well on the leased land on or about May 1, 1954, but no gas from said well has ever been marketed or sold.

On October 24, 1955, plaintiffs commenced this action against the defendants to quiet their title to the property (including pipe and other well equipment defendants had installed thereon) against all claims of the defendants. Their position that defendants no longer had any right, title or interest in and to said property was predicated on the theory, both that defendants had abandoned the leasehold after completing the well in May, 1954, and that the lease had expired by its own terms on account of defendants' failure to produce gas from the leased land by October 31, 1954, the end of the lease's one-year term.

The defendant, Dutton, filed a disclaimer, representing that he had transferred all his right, title and interest in the property to the defendant, Burgin. The defendants Burgin and Marshall filed a joint answer; and the partnership of Horn, Robinson and Nathan filed a similar one. No useful purpose would be served by describing in detail the allegations of these answers, but, generally, and in partial substance, they set forth facts inferring both that plaintiffs had acquiesced in defendants' attempts to find a purchaser for the gas well's production and that, after gas in paying quantities was found in the well, defendants had a reasonable time, under the lease, within which to market it; and that within such period they found a purchaser therefor, but that plaintiffs barred them from going upon the leased premises to do the work necessary to connecting the well with the prospective purchaser's pipe line.

After a non-jury trial, the court took the cause under advisement and thereafter entered judgment for defendants, upon the general finding that "the allegations of plaintiffs' petition are not supported by the evidence * * *". After the overruling of their motion for a new trial, plaintiffs perfected the present appeal.

■ The lease involved here was executed on what is called a "Producers No. 88" form, "With Pooling and Regulation Clauses." It is regular in all respects except that the provisions of the ordinary printed form with reference to delay rentals were stricken out, or obliterated, from it. With this deletion, the only remaining provisions of the lease at all material to the present controversy read as follows:

"It is agreed that this lease shall remain in force for a term of *One (1)* years from this date, and *as long thereafter as oil or gas, or either of them, is produced from said lands* by the lessee.

"In consideration of the premises the said lessee covenants and agrees:

* * * * * *

"And where gas only is found one-eighth of the value of all raw gas at the mouth of the well, *while said gas is being used or sold off the premises,* payment for gas so used or sold to be made monthly. The lessor to have gas free of cost from any gas well on said premises for all stoves * * *

* * * * * *

"To pay lessor for gas produced from any oil well and used off the premises one-eighth of the value of the raw gas at the mouth of the well, payment for the gas so used or sold to be made quarterly.

* * * * * *

"Should the first well drilled on the above described land be a dry hole then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last period which rental has been paid this lease shall terminate as to both parties, unless the lessee on or before the expiration of said twelve months shall resume the payment of rentals, as above provided, * * *". (Emphasis ours.)

It will be observed from the above that the "unless" provision, or only part of the lease expressly providing for its termination, is incomplete and meaningless without the delay rental provision, which, the ordinary Producers 88 form of lease contains. In connection with this part of the lease, it is also perhaps worthy of mention that the Corporation Commission's well-spacing order, in effect in the area, allows only one well on a tract the size of the one here involved. Plaintiffs cite authorities to support the proposition that the duty to market the oil and gas found on the leased premises is an implied covenant on the part of the lessee in oil and gas leases generally, or in the regular forms thereof; but they have failed to point out an *express* covenant therefor in the lease before us. Defendants point out that the mere use of the word "produced" in the quoted "thereafter" clause does not make of that clause such an express provision. They argue, in effect, that the word "market" is neither included in, nor synonymous with,

Webster's definition of the word "produced." They say they could have "produced" gas from the leased premises, within the ordinary meaning of the word, if they had not "shut in" the well, but had left it open to waste its gaseous product into the air. A similar argument was made in Home Royalty Ass'n v. Stone, 10 Cir., 199 F.2d 650, but rejected, because it was a Kansas case, and the court thought that previous opinions of the Kansas Supreme Court required marketing, as well as discovery, citing Ratcliff v. Gouinlock, 136 Kan. 149, 12 P.2d 798, and Tate v. Stanolind Oil & Gas Co., 172 Kan. 351, 240 P.2d 465. It was recognized, however, that what was there considered as the Kansas rule was dictum in the Tate Case and we notice that the Ratcliff Case involved a lease for mining *and producing* clay wherein, at the end of the primary term, clay had been discovered on the leased premises but none separated from its natural strata or reduced to possession so that it could have been marketed. We have been referred to no Oklahoma case, and know of none, in which a lease, like the present one, has been declared terminated at the end of its primary term, on account of the lessee's failure to produce, where, by that time, he had not only discovered oil or gas in paying quantities, but was bringing it to the surface and reducing it to possession in a manner in which it could be, but had not yet been, marketed. Of course, it is easier to see how oil can be produced by bringing it to the surface and placing it in storage facilities (though not marketed until the storage is filled) than in the case of gas where storage is not yet a practical, accepted, or perhaps possible procedure. In this connection, see 9 Okla.L.Rev. 200, Note 4. Regardless of this difference in the nature of the product, however, it cannot be disputed, as Judge Huxman recognized in his dissenting opinion in Bristol v. Colorado Oil & Gas Corp., 10 Cir., 225 F.2d 894, and stated in the majority opinion in Christianson v. Champlin Refining Co., 10 Cir., 169 F.2d 207, 210, that:

"* * * in the very nature of the oil business * * * a reasonable time must intervene between the completion of the drilling operations resulting in production and the ability to market and sell the product of a well."

And this, in the most ordinary, or usual, situations, applies more markedly to the "nature" of the gas business than the oil business.

We do not think some of the statements of the Kansas Supreme Court in the Tate Case, supra, concerning ipso facto termination of a lease for failure to *produce*, can be soundly applied to such termination for failure to *market*. Accordingly, our views are not in accord with their interpretation and application in the Home Oil Co. Case, supra. We refer most particularly to the following statement in the Tate Case, supra [172 Kan. 351, 240 P.2d 468]:

"The great weight of authority, however, appears to be in harmony with the view that actual production during the primary term is essential to the extension of the lease beyond that fixed term. This, at least, is true *unless the lease contains some additional provisions indicating an intent to extend the right to produce beyond the primary term*." (Emphasis ours.)

No valid fault can be found with the above statement, but we say it applies only to production, per se, and as that word is ordinarily defined (not including marketing). To say that *marketing* during the primary term of the lease is essential to its extension beyond said term, *unless the lease contains additional provisions indicating a contrary intent*, is to not only ignore the distinction between producing and marketing, which inheres in the nature of the oil and gas business, but it also ignores the difference between express and implied terms in lease contracts. Here, the lease contains no provision *expressly* requiring the marketing of any gas produced under it. (In fact, it seems to recognize the distinction between production and marketing by its provisions for the payment of royalty on only the gas

that is "used or sold off the premises.") Therefore, if a covenant by the lessee to do so, is to be included within its terms, such covenant can only be an implied one. While statements that could be construed as indicative of a contrary view have been made in cases involving some difference in both facts and law, in at least one jurisdiction (see Stanolind Oil & Gas Co. v. Guertzgen, 9 Cir., 100 F.2d 299; Berthelote v. Loy Oil Co., 95 Mont. 434, 28 P.2d 187) we think the following statement at pages 355 and 356 of Vol. 2, Summers on Oil & Gas (Perm.Ed.) sets forth a correct summation of the decisions of most courts on the matter:

> "*Whenever a duty to perform an act or series of acts is fixed by* contract or *implication* of law, *and the time*, manner, and extent *of performance is not fixed*, the law implies that such act or acts shall be performed diligently. Where, therefore, *oil and gas leases do not state the time, manner, and extent of performance of* express and *implied duties to* test, develop and protect the land and *market the produce, the courts have of necessity tested the lessee's performance by the standards of reasonable men and reasonable diligence.*" (Emphasis ours.)

In this connection, see also Bristol v. Colorado Oil & Gas Corp., supra. The lease before us contains no express covenant to market gas, and likewise contains no express provision as to when this should be done. It therefore follows that it cannot be held to have terminated ipso facto, or by its express terms, on October 31, 1954, on account of the lessee's failure to market gas by said terminal date of its primary term. It also follows that the defendant lessees had a reasonable time after completion of the well to start marketing its product.

■ After determining that if there was any agreement in the lease in question to market the gas from the well involved, it was an implied one, and accordingly that the period lessees had within which to comply with such requirement was not governed exclusively by the terminal date of the lease's primary term—but by what was reasonable under the circumstances—the next question is: Did the trial court err in holding, in effect, that, on the basis of the evidence, arrangements to market the gas were accomplished within a reasonable time?

It may be inferred from the testimony of Mr. McVicker that when the well "came in" or "blew off", about May 2, 1954, it looked, at least in a layman's opinion, like a good well. After it was perforated and hydrofracted, on May 6, 1954, and the lessees installed, near it, a separator, and tanks purchased at least partially on credit from Continental Tank Company, preliminary tests showed, however, that the well's oil production was "somewhere around a barrel * * * a day * * *". The well was then shut in and efforts were begun to try to find a purchaser for the gas. The Oklahoma Natural Gas Company, hereinafter referred to merely as "Oklahoma Natural" had, for about five years, been the principal purchaser of gas from other wells in the vicinity and had a pipe line, for this purpose, about a quarter of a mile, or 1,320 feet, from this well. The lessees contacted this company about purchasing said well's gas production, and, on May 13, 1954, said company made its first test of the well to determine its suitability as a gas-purchase source. On this test, it was found that the well had a volume of 1,226,000 cubic feet of gas, with a flowing pressure, through tubing, of only 96 pounds. Such pressure was inadequate to force gas from said well into Oklahoma Natural's line, in which a pressure of 300 pounds, or more, was maintained. At defendants' instance, Oklahoma Natural again tested the well on July 22, 1954. On this test, it was found that the well's flow pressure, through tubing, had increased to 125 pounds and the gas volume, as then gauged, had increased to more than 1,600,000 cubic feet. After some of the defendants and their agents, including their local attorney, Mr. Daugherty, had repeatedly contacted it in attempts to procure its

agreement to purchase the well's gas output, Oklahoma Natural, by letters from its Mr. Hulings, dated August 19, and October 29, 1954, respectively, refused to so agree, and explained, as above indicated, that the reason for its refusal was the difference in the well's gas pressure and the pressure in its line.

In the meantime, Continental Tank Company had instituted a district court action against defendants to collect the indebtedness incurred on the lease in the aforementioned tank and separator installations, and was about to take judgment therein foreclosing its liens therefor. In fact this litigation developed to the extent that in December, 1954, judgment of foreclosure was entered, and in January, 1955, a receiver was therein appointed over the property, though said receiver did not take possession of it until he advertised it for sale to satisfy the judgment in June, thereafter. Despite this, defendants continued their efforts to find a purchaser for the well's gas, and early in November their attorney, Mr. Daugherty, contacted a Mr. McFess of the Cities Service Gas Company in that endeavor. Evidently, the Cities Service Company also refused to purchase the gas, but at its Mr. McFess's suggestion, Daugherty, on November 8, 1954, wrote Peppers Refining Company, asking if it would look "into the matter of taking the gas * * *". Evidently Peppers answered this letter with one informing the attorney that it had a line ½ mile from the well, with low enough pressure to receive its gas; and, Daugherty wrote Mr. Burgin to that effect, under date of November 16th. Approximately a week later, on November 23, 1954, Oklahoma Natural made its final test of the well. This test showed that it had an "open flow potential" of only 1,113,000 cubic feet and a flow pressure of only 90 pounds. Thereafter, in November or December, 1954, said company submitted a contract to defendants, which provided they accomplish certain work, or meet certain requirements, on the lease, before it would purchase any gas from the well. Two of these requirements

were laying a line from the well to its line, and installing a compressor to increase the pressure of the gas from the well sufficient to "buck" the pressure in, and make the gas enter, Oklahoma Natural's line. Defendants then made an investigation into the costs of meeting the requirements of this contract and finally returned it to Oklahoma Natural, without signature, for (according to various witnesses for defendants) one or all of the following reasons: (1) In view of the $15,000 or $20,000 cost of meeting Oklahoma Natural's requirements, and defendants' opinion that, under the proposed contract, Oklahoma Natural was obligated to purchase gas from the well only as it needed it, in quantities of only 150 or 200 thousand cubic feet per day, it would take at least four or five years to reimburse defendants their cost of meeting these requirements; (2) If Peppers Refining Company, with whom negotiations were pending, would purchase the gas via its low-pressure line, more of the well's potential would be marketed and the above-mentioned expenditures would not be necessary. According to Mr. Becker, one of defendants' witnesses, Peppers offered to buy the gas at a price defendants considered too low; but thereafter, Champlin Refining Company purchased an interest in Peppers' properties in that area, including its gasoline plant and gas-gathering facilities. Thereupon, defendants resumed with Champlin's Mr. J. T. May, the gas-purchase negotiations previously begun with Champlin's Mr. Beebe. Pending these efforts, the lease was sold at a receiver's sale in June, but this was thereafter set aside, apparently pursuant to an agreement whereby Mr. Burgin would satisfy the judgment indebtedness against the property. On a test of the well by Champlin, on July 16, 1955, its open flow potential was measured at 2,672,000 cubic feet per day; and, either then, or thereafter, (the exact date of which does not appear) Champlin indicated its willingness to purchase ¼ of the well's potential (as authorized by order of the Corporation Commission in effect in

that area) at 7¢ per thousand cubic feet. By October 10, 1955, Mr. Burgin had completed satisfaction of the aforesaid judgment indebtedness he had begun in August and apparently at all times since then and/or the completion of its afore-mentioned test, Champlin has stood ready and willing to purchase gas from the well on the aforesaid terms. In fact, even though Mr. McVicker, or plaintiffs through him, put a padlock on the gate of the fence around the leased premises, sometime before the present action was filed in October, 1955, and had prevented defendants, and any others who would attempt to do so, from going on said premises to install a pipe line and connect the well to it for gas-marketing purposes, Champlin prepared a contract, dated November 30, 1955, and mailed it to defendants' Mr. Becker, under which it can and will market the gas on the afore-mentioned terms.

Under the above facts, it is our opinion that the trial court's judgment for defendants cannot be held to be clearly against the weight of the evidence. Mr. Burgin testified that : "Since the first day we completed this well, we did continuous work in trying to get a gas connection to (it) * * *". While this is a conclusion of the witness, we believe the facts we have mentioned, and others unnecessary to detail, tend to support it. They also show that defendants persisted in their efforts despite the fact that they almost lost the property in the lien foreclosure proceedings herein described. Plaintiffs have failed to point out any manner in which defendants could have been more diligent than they have been, except to argue that they should have started selling gas to Oklahoma Natural when it submitted its contract of November, 1954. They point out that there is evidence showing defendants could have purchased a used gas compressor for only $8,000, but no evidence was introduced to show that defendants' compliance with all of Oklahoma Natural's requirements would not have cost the $15,000 or $20,000 testified to by defendants' witness, Mr. Nathan. Nor did plaintiffs introduce any evidence that a reasonably prudent operator would have entered into such a contact at that time, when they then had good reason to believe that another prospective purchaser would purchase the gas on terms that should prove more profitable and satisfactory not only to themselves but to the plaintiff royalty-owners, as well. Nor is there any evidence that, when defendants procured the setting aside of the receiver's sale, plaintiffs objected. There is testimony on behalf of defendants (contradicted by McVicker), however, that about the time Mr. Burgin paid the judgment indebtedness against the property, Mr. McVickers indicated to him that he would "go along" with defendants' further efforts to market the gas. While this may furnish little, if any, basis for defendants' plea of estoppel, it perhaps received some consideration by the trial court. In this connection, see Bristol v. Colorado Oil & Gas Corporation, supra, 225 F.2d at page 898.

Oil and gas lessees should not be allowed to hold their leases indefinitely, while no product therefrom is being marketed and diligent efforts are not being made to accomplish this, or where, despite their efforts, there is no reasonable probability they will be successful. We agree with the majority opinion in Bristol v. Colorado Oil & Gas Corp., supra, 225 F.2d at page 897 that the rule of reasonableness here applied is *not* "unlimited in the face of diligent effort" and that such a lease may be cancelled regardless of the intensity of the lessee's efforts, where there is no reasonable probability that same will be successful, or it appears that others, with less effort, would succeed where they have failed. If such lessee cannot market the product, there is no purpose to be served, under the terms of the lease, in his retaining it, and it is difficult to conceive of any reason it should not be cancelled. The fact that the lessee has at one time invested money in it certainly would not warrant his holding it indefinitely without development, marketing, or payment of rentals for its future speculative value. This case, like others of the same charac-

ter, must be determined on its own particular facts. Here, there is no evidence to invoke such considerations.

In accord with the foregoing, the judgment of the trial court is affirmed.

WELCH, C. J., CORN, V. C. J., and DAVISON, HALLEY, JOHNSON, WILLIAMS and CARLILE, JJ., concur.