FLAG OIL CORPORATION OF DELA-
WARE, Plaintiff in Error,

v.

KING RESOURCES COMPANY et al.,
Defendants in Error.

No. 43873.

Supreme Court of Oklahoma.

Feb. 1, 1972.

Rehearing Denied March 13, 1972.

Carl Pinkerton, James C. Pinkerton, Tulsa, for plaintiff in error.

Harry C. Marberry, Oklahoma City, for defendants in error, King Resources Co. and Slats Honeymon Drilling Co.

BARNES, Justice:

The question in this appeal involves the effect, if any, of an amendment to an oil and gas lease, upon the continuance of the lease under the circumstances hereinafter described.

The lease is dated August 8, 1957. The lessors are Flag Oil Corporation of Delaware and Panhandle Cooperative Royalty Company, usually referred to hereafter as "Flag" and "Panhandle", respectively. One C. M. Fleetwood was lessee.

The lease's primary term was five years from its date with the added potential for extension provided by a conventional "thereafter" provision.

The leased acreage is part of an area designated for the production of gas from 640-acre drilling and spacing units by an order this State's Corporation Commission entered in April, 1959. In the same year, King-Stevenson Oil Company, Inc., hereafter referred to as "K-S", acquired most of the lessee's 7/8ths working interest in the lease, and, in September of that year, K-S, and an associate, commenced drilling a well on the lease's Section 1 land. This well is denominated the "No. 1 Thompson"

and was completed as a producing gas well in the Morrow Formation on November 9, 1959. The well then had a potential production of 9,000 MCF per day.

Thereafter, on February 12, 1960, K–S and the defendant in error, Slats Honeymon Drilling Company, to which it had assigned an undivided ½ interest in the lease, designated all of Section 1 as one of the unitized area's gas production units.

As the Thompson well has no pipe line connection and remained shut in, the lessee, K–S, on March 25, 1960, wrote the lessors, Flag and Panhandle, a letter representing that a "diligent effort" was being made to obtain a market for the well's gas. Among other things, the letter stated:

"As the majority of the leases in this area contain a shut-in gas cluase and these people receive shut-in gas royalty, we would like to pay you on this basis also. However, as your lease does not contain a shut-in gas clause, we are enclosing Amendment to Oil and Gas Lease which provides for making shut-in gas royalty payments.

The letter solicited execution of the enclosed form. Flag and Panhandle responded March 30, 1960, as follows:

"We have your letter of March 25, and wish to advise that these companies do not sign perpetual shut-in gas clauses. We will, however, give you a limited one if such is desired.

"We note that *you have two more years to run on the lease* and since the well is shut-in, we feel sure that *you are within your rights to pay us* $1.00 per acre *rental especially for the term of the lease and so long thereafter as there is no market available for the gas.*

"However, if as above stated, you desire two to three years shut-in gas clause *after the expiration of the lease,* we will change this amendment to read so and execute same and send to you." (Emphasis added)

A few days thereafter, K–S's Oklahoma City office received a letter from Flag and Panhandle, dated April 6th, enclosing the agreement (entitled "AMENDMENT TO OIL AND GAS LEASE," but referred to in said letter as a "two-year shut-in clause"), which later became the subject of the controversy precipitating the present action. The controversial portion of said agreement appears in the following excerpt:

" *     *     *     *     *     *

"WHEREAS, Lessor does desire to amend said Oil and Gas Lease to add a provision relating to shut-in gas wells.

"NOW THEREFORE, for and in consideration of the sum of $1.00 and other good and valuable consideration, paid by KING-STEVENSON OIL COMPANY, INC. to Lessor, receipt of which is hereby acknowledged, Lessor does agree that said Oil and Gas Lease be amended by adding the following provision thereto:

"(5) 'Where gas from a well producing gas only is not sold or used, Lessee may pay or tender *a* royalty One Dollar ($1.00) per year net royalty acre retained hereunder, such payment or tender to be made, *on or before the anniversary date of this lease* next ensuing after the expiration of ninety (90) days from the date such well is shut in and thereafter on the anniversary date of this lease during the period such well is shut in, to the royalty owners or to the royalty owners' credit in the rental despository bank hereinafter designated. *If such payment or tender is made it will be considered that gas is being produced within the meaning of the preceding paragraph.'*

"It is further provided that *lease cannot be perpetuated beyond August 8, 1964, by payment of shut-in gas well royalties* as provided in Paragraph 5, hereof, *but this restriction shall not present the perpetuation of this lease under other provisions of same.*

*     *     *     *     *     *"
(Emphasis added)

On the anniversaries of the lease's execution in August, 1960 and 1961, K–S paid

to, or for the benefit of, Flag the sum of $1.00 for each acre of Flag's 9.94-acre interest, as delay rentals, but, on August 8th of each of the subsequent years, 1962 and 1963, it paid Flag that amount as "shut-in royalty."

On July 23, 1964, K–S wrote Panhandle that it had been unable to obtain a market for the Thompson well's gas and asked that the subject lease be extended another year. Almost two months later, on September 17th, Flag replied to K–S's letter, noting that the lease's hereinbefore quoted Amendment had specified a "cut off date" of "August 8, 1964," and requesting that the lease be released (as having expired). On September 23rd, K–S wrote Flag refusing to give the release. Thereafter, on October 1, 1964, Flag wrote K–S returning a cashier's check in the amount to $9.94 K–S had tendered the depository bank to be credited to Flag's account.

On March 23, 1966, the Northern Natural Gas Company finally agreed to purchase the Thompson well's gas, and forwarded to K–S a proposed gas purchase contract for a term of twenty years, beginning on June 10, 1966. K–S executed this contract and returned it to Northern Natural Gas Company in May, 1966. In September, 1966, the Federal Power Commission first authorized sale of gas under said contract, and sale of the Thompson well's gas was thereafter commenced in December of that year.

On April 25, 1967, K–S's successor, King Resources Company, mailed division orders covering gas taken from the well, and three days later wrote Flag a letter stating its position that the lease was still in force and informing Flag that the proceeds from the sale of its share of the gas would be withheld until an executed division order had been received from it. Flag received a similar letter from Slats Honeymon Drilling Company a few days later.

More than a year and a half later, in January, 1969, Flag (hereafter referred to as "plaintiff") commenced the present action, alleging, in substance, that since the lessees, King Resources Company and Slats Honeymon Drilling Company (hereafter referred to as "defendants"), had sold and marketed no gas from the Thompson well on or before August 8, 1964, the lease had terminated, and that said plaintiff was entitled to judgment cancelling the lease and requiring said defendants to account for its share of all production marketed from the well after that date.

In their answer, and at the trial, defendants took the position that their lease did not expire on August 8, 1964, (the date set forth in the hereinbefore quoted amendment thereto) and that since they had used diligence in their efforts to market the Thompson well's gas, though without success until gas sales commenced under the aforementioned contract with Northern Natural Gas Company, the lease still subsists and they are entitled to continue producing gas from the leased land.

At the trial, the facts already stated, and others unnecessary to mention, were stipulated; and, on the basis thereof, the trial court filed a written memorandum of his views and entered judgment for defendants refusing to cancel the lease. He found that the amendment did not require the gas to be marketed on or before August 8, 1964, and that such marketing had commenced within a reasonable time.

Plaintiff contends that, under the terms of the lease amendment, the payment of shut-in royalty was "equated" with production and that it was intended to require production on and after the expiration of the lease's primary term as a prerequisite to the continued life of the lease beyond August 8, 1964, allowing payment of shut-in royalty as a substitute for production only for the period between August 8, 1962, and August 8, 1964. Plaintiff quotes a portion of the Court's opinion in Hastings v. Pichinson (Tex.Civ.App.), 370 S. W.2d 1, as supporting the proposition that when a lease contains a shut-in gas well provision limited in time, there must be actual production before the end of that time period, or the lease expires. Plaintiff

charges that the distinction the trial court mentioned in his aforementioned memorandum, between that case and this one, does not exist. Since our decision to affirm or reverse the trial court's judgment need not be based upon that court's stated reasons for it, we express no opinion of them. See Winslow v. Watts, Okl., 446 P.2d 598 (2nd syll.).

In McVicker v. Horn, Robinson & Nathan, Okl., 322 P.2d 410, 71 A.L.R.2d 1211, this Court said that the rule (quoted therein from Tate v. Stanolind Oil & Gas Co., 172 Kan. 351, 240 P.2d 465) that *actual production* under a lease during its primary term is essential to the lease's extension beyond that term, *does not apply to the marketing* of the production, unless the lease expressly requires it. And we there held that, in the absence of such an express requirement, the lessee's duty to market is based only upon an implied covenant, "in which instance" the lessee "has a reasonable time, after the completion of the well, to comply with such covenant." It is evident, from an examination of our opinion in that case, that both the diligence of the lessee's efforts, and the reasonable probability of their success, are factors to be taken into consideration in determining what constitutes a "reasonable time" under this rule. In the Hastings case, supra, these matters were apparently not involved. We consider that case distinguishable from the case at bar, and neither controlling, nor persuasive, here.

Plaintiff further contends, however, that this case comes within the exception implied in the statements of the rule, where the lease "in express terms" provides for marketing the production. The trial court was of the view that the lease amended involved here contained no such *express* provision. We agree. We think it significant that the date plaintiff has referred to as the "cut off date" for the payment of shut-in royalty is an anniversary date of the lease's *primary term.* And it is obvious that since the lessees' duty to market is only implied from, rather than being ex-

pressed in, the original provisions of the lease, the trial court's interpretation of the lease amendment cannot be held to be contrary to, or in conflict with, the *express* provisions of the lease (as plaintiff argues). On the other hand, that interpretation is permitted under the lease amendment's last hereinbefore quoted provision that: ". . . this restriction shall not prevent the perpetuation of this lease *under other provisions of same*" (emphasis added) because the lessees' implied covenant to market the lease's production emanates from "other provisions" of the original lease, rather than being *expressed* in any provision of the subject amendment. And we do not accept plaintiff's unsupported statement that the word "provisions", as used in that last quoted part of the amendment, cannot refer to that implied "provision", or covenant, as to marketing. Thus, for these reasons and others unnecessary to delineate, we reject all of plaintiff's arguments under its "POINT II", including the one that the distinction between "production" and "marketing", noted in McVickers, supra, does not apply to this case, because it was eliminated from consideration by the terms of the subject lease amendment.

After analyzing the undisputed and stipulated facts, we are of the opinion that the purpose of the lease amendment was to permit the extension of the lease's *primary term* by the payment of shut-in royalty, so that, during such extension, the lease would not terminate on account of the lessee's failure to market gas produced on the leased land. We think the trial court was correct in holding that under the lease, as thus amended, the lessees had a reasonable time after August 8, 1964, within which to market such production.

For the same reasons referred to above, we also reject plaintiff's arguments under its "POINT V".

Nor do we find sufficient merit for reversing the trial court's judgment in plaintiff's arguments under its Points "III" and "IV". In brief substance, these are that

the trial court's construction of the lease, as amended, is contrary to the evidence as to the parties' intention in making the amendment and to the "contemporaneous" construction they gave it. As above indicated, we have thoroughly examined the record and find that the judgment cannot be held to be clearly against the weight of the evidence.

In view of our conclusions, it is unnecessary to consider plaintiff's arguments under its Points "VI" and "VII", as all pertain only to the kind of decision that should be rendered, in the event the trial court's judgment is reversed.

In accord with the foregoing, the judgment of the trial court is hereby affirmed.

All Justices concur.