**Frank POAFPYBITTY et al., Appellants,**

v.

**SKELLY OIL COMPANY, a corporation, Appellee.**

**No. 44668.**

Supreme Court of Oklahoma.

Sept. 25, 1973.

Rehearing Denied Jan. 8, 1974.

Houston Bus Hill, Coleman Hayes, Oklahoma City, for appellants.

S. W. Wells, Sam C. Oliver, Tulsa, John H. Cantrell, Cantrell, Douglass, Thompson & Wilson, Oklahoma City, for appellee.

LAVENDER, Justice:

This is an appeal from a judgment for defendant by the District Court of Oklahoma County and its Order sustaining a motion for summary judgment by defendant Skelly Oil Company, oil and gas mining lessee of allotted lands held in trust for plaintiff Indians by the United States. Plaintiffs' petition alleged that, notwithstanding demand by plaintiffs upon defendant to market gas being produced and flared from wells on plaintiffs' land, defendant failed and refused to do so, although there was a gas line operated by Lone Star Gas Company within one-half mile of the land on which the wells were situated. It was also alleged that defendant failed and refused to exercise reasonable diligence in the prevention of waste of the gas and to preserve the oil and gas producing properties as required by the lease. Plaintiffs claim breach of contract by defendant and damages in the loss of royalty resulting from waste occasioned by wrongful and illegal operations of the lease by defendant. The gas concerned was casinghead gas produced with the oil and vented during the period of April 1956 to February 1961.

In its answer defendant made a general denial and further claimed that it operated in accordance with the terms of the lease, and with full approval of the United States and its wards, the plaintiffs, whose claims were thereby estopped. In so saying defendant listed twelve matters that it says were determined by the Government, one being that the Government's supervision and management of the mineral lease was so directly involved that the decisions upon these matters [of operation] were that of the Government.

In sustaining defendant's motion for summary judgment the trial court found that there was no issue of material fact to be tried in the cause, and that defendant was entitled to judgment against plaintiffs as a matter of law. We agree.

■ The matter of when it is proper for a trial court to render a summary judgment was discussed in Occidental Fire & Casualty Company of North Carolina v. Box (1971) Okl., 497 P.2d 1076 in this manner:

".  .  . In French v. Sotheby & Company, Okl., 470 P.2d 318 (1970) we held that:

'Rules for the District Courts, rule 13, 12 O.S.Ann.C. 2 Appendix, permit rendition of a summary judgment if it appears that there is no substantial controversy as to any material fact and that any party is entitled to judgment as a matter of law, but there can be no trial of fact issues since the function of a motion for summary judgment is to determine whether there are any genuine issues as to material facts.'

In Flick v. Crouch Welding Service, Okl., 434 P.2d 256 (1967), we said that the summary judgment rule (Rule 13, supra) was:

'* * * patterned after Rule 56 of the Fed.Rules Civ.Proc., 28 U.S.C.A. The object of that rule is to avoid a

useless trial, and a trial is not only useful but absolutely necessary where there is a genuine issue as to any material fact. On motion for summary judgment there can be no trial of fact issues since its function is to determine whether there are any genuine issues as to material facts. Such motion should therefore be denied if under the evidence reasonable men might reach different conclusions from undisputed facts. Michel v. Meier, D.C., 8 F.R.D. 464; Neff v. World Pub. Co., 8 Cir., 349 F.2d 235.'

In Perry v. Green, Okl., 468 P.2d 483 (1970), we said that a motion for summary judgment should be denied if the facts concerning any issue raised by the pleadings, as set forth in the depositions, admissions, answers to interrogations and affidavits on file in the case, are conflicting, or if reasonable men, in the exercise of a fair and impartial judgment, might reach different conclusions from undisputed facts concerning any issue as set forth in such instruments."

However, the court shall render judgment if it appears that there is no substantial controversy as to any material fact and that any party is entitled to judgment as a matter of law. Pettit v. Vogt (1972), Okl., 495 P.2d 395; Rule No. 13, Rules for District Courts, 12 O.S., Ch. 2, Appendix.

We shall test the matters presented against the foregoing requirements.

History of the court action in this matter is reflected in Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 wherein the U.S. Supreme Court held on the question then at hand that the Indian lessors had the capacity to maintain an action seeking damages for the alleged breach of the oil and gas lease. It was also there observed, with citations to the Code of Federal Regulations, that the Secretary of the Interior is authorized to promulgate regulations controlling the operation and development of the lease and to issue necessary written instructions to the lessee; that the lessee will furnish a surety bond; that the Secretary has the power to inspect the leased premises and the books and records of the lessee; that the Secretary has the power to impose restrictions as to the time for the drilling of wells or the production from any well "as in his judgment may be necessary or proper for the protection of the natural resources of the leased land and in the interest of the Indian lessor;" that the lessee must furnish the Secretary with a monthly report disclosing all operations conducted on the lease, and must pay the royalties to the Secretary who deposits them to the credit of the Indian lessor; that the lessee agrees to drill wells which the Secretary determines are necessary to protect the leased land from drainage by another well on adjoining property; and the lessee is obligated to prevent the waste of oil and gas and agrees to pay the Indian lessor the full value of all gas wasted, unless the Secretary determines at the request of the lessee that the waste was sanctioned by state and federal law. The court further observed that if there were a determination of waste, the Government would file court action, but that this power of the United States to sue did not diminish the right of the plaintiff Indian to maintain an action to protect the lease. We parenthetically note here that the record reflects no determination of waste sanctioned by state or federal law.

The decision by the U.S. Supreme Court in Poafpybitty that plaintiffs have a capacity to maintain this action, and our own interpretation of the Government's responsibilities as reflected in provisions of the Code of Federal Regulations related by the Court, effectively answer the estoppel argument of defendant. Responsibility for the lease operation is that of the lessee. We therefore eliminate any inference of governmental approval of defendant's actions in our determination of whether the trial court properly found that there was no genuine issue of material fact to be tried in the cause.

Regarding protection of the lease, the lease provides in part:

"3. In consideration of the foregoing, the lessee hereby agrees:

\*   \*   \*   \*   \*   \*

(f) Diligence, prevention of waste—To exercise reasonable diligence in drilling and operating wells for oil and gas on the lands covered hereby, while such products can be secured in paying quantities; to carry on all operations hereunder in a good and workmanlike manner in accordance with approved methods and practice, having due regard for the prevention of waste of oil or gas developed in the land . . . "

The obligations of lessee also are of an implied nature, as was noted in McVicker v. Horn, Robinson & Nathan (1958), Okl., 322 P.2d 410, 71 A.L.R.2d 1211, where this court quoted with approval from pages 355 and 356 of Vol. 2, Summers on Oil & Gas (Perm.Ed.) as follows:

"Whenever a duty to perform an act or series of acts is fixed by contract or implication of law, and the time, manner, and extent of performance is not fixed, the law implies that such act or acts shall be performed diligently. Where, therefore, oil and gas leases do not state the time, manner, and extent of performance of express and implied duties to test, develop and protect the land and market the produce, the courts have of necessity tested the lessee's performance by the standards of reasonable men and reasonable diligence."

Thus, we may look directly to defendant's manner of performance of its implied duties to market the casinghead gas under the circumstances then prevailing. It is not necessary, as defendant's brief urges, to go into defendant's relationship with the United States and any supervision and determinations made by the Department of the Interior, nor even whether defendant's action in venting the casinghead gas and producing the oil that came with it was beneficial to plaintiffs—from standpoint of prevention of drainage by wells on adjacent leases, or otherwise. The question for the trial court in acting on defendant's motion was simply whether there was a genuine issue that defendant did or did not diligently act to prevent waste of the casinghead gas being produced with the oil.

Plaintiffs, in urging that a market existed for the gas, point to the following:

March 5, 1957. Lone Star Gas Co. wrote a letter to defendant Skelly referring to recent conversations, and submitting a Gas Purchase Contract covering plaintiffs' acreage. The subject matter was all of the legally produced gas, including casinghead gas, of whatever kind or character, with a bargaining price of 10¢ per mcf to and including December 31, 1957, increasing to 11¢ for the period January 1, 1958 through December 31, 1962, 12¢ for the period January 1, 1963 through December 31, 1967, and 13¢ thereafter.

June 10, 1957. Skelly replied, objecting to the proposed contract insofar as it pertained to casinghead gas because: 1. It would prevent Skelly from disposing of the casinghead gas to any plant that might be built by someone else in the area; Skelly stating that it thought that the contract should be limited to gas-well gas. 2. It did not permit use of gas for gas lift repressuring or pressure maintenance, although it was doubtful that this would ever be done, and 3. It did not contain a "minimum take" clause. October 24, 1957, evidently following conferences between representatives of the two companies, another contract was proposed by Lone Star, the subject matter being all of the legally produced gas, excluding casinghead gas, of whatsoever kind or character, with Skelly entitled to use sufficient gas for repressuring, pressure maintenance, and/or gas lift operations.

Plaintiffs state that Lone Star appeared to have succumbed to all suggestions and requirements by Skelly, and that the record reflected no complaint by Skelly about price. Conversely, defendant's posi-

tion is that no sensible operator could have reasonably accepted the contract.

Defendant refers to the March 5, 1957, letter and a provision in the proposed contract that accompanied it for a 20 year term, and then to a plaintiffs' exhibit letter of March 8, 1957, from Skelly to Lone Star that criticized the absence of a guaranteed "minimum take" provision. Defendant says that no such guarantee was ever made, and points out that under the proposed contract, all of the gas, both casinghead and natural gas, would be tied up for 20 years without any commitment of the purchaser to take any particular quantity.

Defendant comments on the proposed contract sent by letter of October 24, 1957, as being irrelevant because it excluded casinghead gas, the type concerned here. We note here, however, that it is relevant on the point that defendant had objected to inclusion of casinghead gas in the first proposed contract. Of course, as indicated, that was not the sole objection to the first proposed contract. Notwithstanding defendant's view that Lone Star's second proposed contract was irrelevant because it did not deal with casinghead gas, in its brief defendant also found it objectionable because if Lone Star did not take certain minimum quantities it, Lone Star, could tender cancellation and release of the contract, and if not accepted, or if the release of the contract were not approved by the Federal Power Commission, then minimum purchase obligations set forth in the contract would be void.

On December 24, 1957, Lone Star inquired about its proposed contract sent by letter of October 24th and was told by Skelly in a letter of February 10, 1958:

"There are two reasons why we have not attempted to do anything with the Aitson gas in the West Marlow Field of Stephens County, Oklahoma. First, there have been, as you know, efforts to put a plant together on the casinghead gas and it seems reasonable that a firmer market for residue might be obtained if the same purchaser had the opportunity to buy the gas-well gas as well as the residue gas. Secondly, it has been rumored that another pipeline company may enter the area, offering prices up to 15¢ per MCF and, not being pressed to make an early disposition, we thought we'd wait and see if there was any thing to it.

"Of one thing I would assure you, and that is that we will not make a commitment to anyone until we have first given you every opportunity to see what you can do."

As the letter indicates, a "firmer" market for residue gas (processed casinghead gas) was desired. It also indicates that Skelly was not being pressed to make an early disposition, thereby permitting an inference that it would not hasten to do so, but this is not inconsistent with the fact, as reflected in the letter, that efforts had been made to arrange for the disposition of the casinghead gas.

The letter of February 10, 1958, by Skelly is a plaintiffs' exhibit, and it, with its references to activities that would establish an advantageous market, together with provisions of the first proposed contract from Lone Star, and other matter reflected hereinafter in the paragraph and supported elsewhere, is enough to decide this matter. We specifically discount from consideration all self-serving declarations in the affidavit of L. L. Byars, Vice-President of the Natural Gas Department of Skelly Oil Company together with all of his references to negotiations with one named and other unnamed potential purchasers, accepting only the fact of his negotiations with West Marlow Gas Corporation, later "Cypress Mining Company," begun in December, 1969 and defendant's contract with that company executed on August 3, 1960, for 20 years of total production, which appear subject to proof as indicated elsewhere in the record. Byars also states, and it is accepted, that deliveries of gas commenced in February, 1961; that Cypress Mining resold the gas to Lone Star

for 14¢ per mcf; and that this is the price on which royalty is being paid.

■ Byars's affidavit is discounted in this manner because, as is pointed out in plaintiffs' cited case of Sartor v. Arkansas National Gas Corporation, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967, wherein Rule 56 of the Federal Rules of Civil Procedure, the pattern for our Rule 13, supra, is dealt with, in considering the affidavit of an interested witness, the fact of his interest in the result of a suit is sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact. We add, however, that such strictness of consideration does not apply to a statement in an affidavit that is uncontroverted and has indication of support elsewhere in the record. We thus preserve the salient reason for the use of affidavits in summary judgment matters, i. e., placing before the court important matter that may aid in avoidance of a useless trial.

In addition to attacking Byars' affidavit, plaintiffs attack defendant's use of letters and memoranda to and from the Department of the Interior purportedly reflecting approval by certain personnel in that Department of the activities by Skelly. In this regard, as indicated earlier, we specifically state that this decision is in no way based on such purported approval.

We do consider as material and relevant defendant's exhibits admissible pursuant to stipulation made by the parties (subject to objection as to relevancy, materiality and competency other than as to identification) which are interdepartmental memoranda of the Department of the Interior, Geological Survey reflecting sale of both dry gas and casinghead gas from the lease beginning in January, 1961 for dry gas, and February, 1961 for casinghead gas, with royalty paid thereon at 14¢ per mcf. This is because price and sale of both types of gas indicates responsibility by defendant lessee in seeking an advantageous contract. Also, pertinent on the question of availability of a casinghead gas market is a departmental statement that no oil well gas (casinghead)

was known to have been sold from any leases offsetting subject lease prior to November, 1960; three months before sales of oil-well gas commenced from subject lease.

It is also noteworthy that Department of Interior, Geological Survey memorandum records reflect its experience that an immediate market for gas from any newly discovered oil or gas field [as here] is uncommon; that the usual practice is for purchasers to await development of, or proving of, sufficient reserves to justify installation of gathering and/or processing equipment; and that development of the lease concerned took place between May, 1956 and January, 1958. This, of course, bears on whether defendant lessee was diligent in its efforts to find a market and enter into a contract for sale of the casinghead gas.

A letter exhibit to a deposition of Hammond Soyster, then district engineer and deputy supervisor for the U.S. Geological Survey, Department of the Interior, over the area concerned (statements within the exhibit being adopted by Soyster) indicates that in many instances the purchaser is not required to take all the available gas with the excess gas being vented, as is done under defendant's contract with the West Marlow Gas Corporation. The letter also states that the price being paid for the gas [under the contract ultimately written] is above the average price then being paid for gas of like quality in that section of Oklahoma. This, of course, bears upon the reasonableness of defendant's actions in marketing the gas.

■ As indicated, lessee's performance is measured by the standards of reasonable men and reasonable diligence. McVicker v. Horn, Robinson and Nathan, supra. Further, while an oil and gas lessee has a duty to find a market for casinghead gas produced on leased premises, that duty exists within normal procedures and practices of the existing industry. Craig v. Champlin Petroleum Company (10 Cir., 1971), 435 F.2d 933, a case arising in Oklahoma.

Plaintiffs say that the question of reasonableness of defendant's actions remains one of fact. Even so, measured by standards of reasonableness, as aforesaid, we find no substantial controversy as to the material fact of whether defendant was diligent in seeking to properly market the casinghead gas. The trial court, having found that there was no issue of material fact to be tried in the cause, properly found that defendant was entitled to judgment as a matter of law. Rule 13, Rules for the District Courts; Occidental Fire & Casualty Co. of North Carolina v. Box, and cases cited. Its determinations are supported by the record exclusive of those matters which we have indicated that we have not considered.

Judgment affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and IRWIN, BERRY, HODGES, BARNES, and DOOLIN, JJ., concur.

SIMMS, J., concurs in result.