OSCN Found Document:HALL v. GALMOR

 

 
 

 
 HALL v. GALMOR
2018 OK 59
Case Number: 115078
Decided: 06/26/2018
As Corrected: July 16, 2018
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2018 OK 59, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

E.L. HALL, d/b/a HALL FAMILY PRODUCTION, Plaintiff/Appellant,
v.
MICHAEL STEPHEN GALMOR a/k/a STEVE GALMOR, d/b/a MSG OIL AND GAS, and the ESTATE OF PAUL STUMBAUGH, Defendants/Appellees.

ON APPEAL FROM THE DISTRICT COURT OF BECKHAM COUNTY,
STATE OF OKLAHOMA
HONORABLE FLOYD DOUGLAS HAUGHT, DISTRICT JUDGE

Â¶0 This appeal concerns the trial court's judgment after a bench trial that denied the Appellant's petition to cancel Appellee's oil and gas leases, to quiet title in favor of the Appellant's "top leases," and to hold Appellee liable for slander of title. This Court retained the appeal to address several issues of first impression. We decline to adopt the definition of "capability" propounded by the Appellant and affirm the district court's finding that Appellee's wells were capable of production in paying quantities. We affirm the district court's judgment insofar as it quieted title in Appellee's favor as to leasehold interests located inside those wells' spacing units. We reverse the district court's judgment, however, insofar as it quieted title in Appellee's favor as to leasehold interests in lands falling outside those wells' spacing units, because the statutory Pugh clause found in 52 O.S. Â§ 87.1(b) so requires. We further find that the title of the bill enacting the statutory Pugh clause did not violate Article V, Section 57 of the Oklahoma Constitution and that the effect of the statutory Pugh clause upon Appellee's leasehold interests does not result in an unconstitutional taking in violation of Article II, Section 23 of the Oklahoma Constitution. Lastly, we reverse the district court's judgment insofar as it quieted title in Appellee's favor as to leases upon which no well has ever been drilled.

JUDGMENT OF THE DISTRICT COURT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS

Keith A. Needham and Amy N. Wilson, NEEDHAM & ASSOCIATES, PLLC, Oklahoma City, Oklahoma, for Appellant.
Charles P. Horton, HORTON & ASSOCIATES ATTORNEYS AT LAW, P.C., Altus, Oklahoma, and G. Dale Elsener, Edmond, Oklahoma, for Appellee Michael Stephen Galmor.
Randy Mecklenburg, Andrew E. Karim, and Michelle L. Nabors, HARRISON & MECKLENBURG, INC., Kingfisher, Oklahoma, for Amicus Curiae, Oklahoma Mineral Owners Association.

Wyrick, J.:
I. FACTUAL AND PROCEDURAL BACKGROUND
Â¶1 Between 1954 and 2008, the predecessors-in-interest for Appellee Michael Stephen Galmor d/b/a MSG Oil and Gas ("Galmor") entered into thirty oil and gas leases covering mineral interests in lands located in Beckham County, Oklahoma.[1] All thirty leases contained habendum clauses that made the leases valid for primary terms lasting between 90 days and 10 years and then for secondary terms thereafter lasting as long as oil or gas is "produced" from the leased premises. In the event production ceased during the secondary term, twenty-nine of the leases also contained "cessation of production" clauses that gave the lessee a grace period ranging between 60 days and 6 months during which to re-establish production either by reworking the existing well or by drilling a new well.[2]
Â 
Â¶2 During the primary terms of those leases, Galmor's predecessors-in-interest drilled seven wells into the Granite Wash formation and the Permian Dolomite (a/k/a Brown Dolomite) formation.[3] These seven wells were located on lands covered by fourteen of the thirty leases at issue.[4] The lands covered by two of those fourteen leases were also subject to voluntary pooling agreements with lands covered by six more leases on which no wells had been drilled.[5] The lands covered by the remaining ten leases did not have completed wells and were not otherwise held under a voluntary pooling agreement or a statutory spacing unit.[6]
Â 
Â¶3 During the secondary terms of the fourteen leases on which wells had been drilled, six of the seven wells actually produced oil and gas.[7] Some of the wells drilled prior to the 1990's ceased production for "a number of years" during that decade, but afterwards attained their previous production levels.[8]
Â 
Â¶4 Galmor's immediate predecessor-in-interest, a Texas corporation named Marion Energy Inc. ("Marion Energy"), stopped pumping gas out of the Denby 2, Speed B-4, G.S. Spencer 1, R.B. Jordan 1, and R.B. Jordan 2 wells in August 2011 and on the Speed 6-B well in January 2012.[9] The trial court found that "no one really knows why production ceased [because] . . . . [a]ll [of Marion Energy's] principals are gone and are probably bankrupt."[10] But one witness who formerly worked for Marion Energy postulated that the wells were not very productive after Marion Energy replaced jack pumps with plunger lifts and that this poor production technique ultimately resulted in the repossession of Marion Energy's rented compressors that had allowed it to market to a buyer who owned a high-pressure line to north of the field.[11]
Â 
Â¶5 The seventh well, the Dalton Counts 1-16 well, produced and marketed 1,675 Mcf of natural gas during its six months of operation. Marion Energy stopped pumping gas out of the Dalton Counts 1-16 well in May 2008.[12] This shut-down occurred during the primary term of seven of the eight relevant leases; the eighth lease had just passed into its secondary term after a short six-month primary term.[13] Again, the particular reason for the shut-down was unclear.[14]
Â 
Â¶6 Within a few months of all wells being shut down, Marion Energy was looking to offload all of its assets in Beckham and Greer Counties. In the spring of 2012, Marion Energy contacted Galmor about its desire to sell the seven wells at issue, approximately fifty other wells, and a gas-gathering system for $2,000,000. Galmor declined the offer because of the price.[15] By December 2013, Marion Energy had also approached Appellant E.L. "Bo" Hall d/b/a Hall Family Production ("Hall").[16] Although Hall was interested in purchasing the seven wells at issue in this lawsuit, he did not wish to buy any of the other assets. Marion Energy, however, was not interested in selling its assets in piecemeal fashion. Instead, Hall suggested that Marion Energy approach one of his investors, James Steedly of Triple "S" Gas, Inc.[17] In early 2014, Marion Energy apparently lowered its asking price to $200,000 for all potential buyers.[18] Galmor inspected all the wells being sold in January 2014, but put everything on hold once it appeared someone else might buy the wells.[19] During February and March 2014, Triple "S" Gas directed Hall to exercise due diligence by inspecting the public record on Marion Energy's leases and production records.[20] Hall notified Marion Energy on April 22, 2014, that Triple "S" Gas was not interested in pursuing acquisition of Marion Energy's assets "due to issues surrounding the marketability of title to the underlying leases and Marion Energy's failure to market the product and/or pay shut-in royalties for the last three years."[21] Five months later, on October 4, 2014, Galmor and Marion Energy signed an agreement for the purchase of all assets at the reduced price, and the Corporation Commission transferred operations to Galmor on October 30, 2014.[22]
Â 
Â¶7 Despite his refusal of Marion Energy's proposed deal, Hall's quest for Marion Energy's property did not end in April 2014. Between April and June, Hall secured and recorded "top leases" from fifteen mineral owners that covered many of the same lands covered by Marion Energy's fourteen "bottom leases" on which the seven wells are located.[23] The trial court found that "it is more probably true than not that plaintiff Hall was purchasing new leases from the royalty owners at the same time he was negotiating with Marion Energy for a purchase of Marion's interest."[24] Hall pursued these leases because he apparently thought the seven wells at issue were capable of producing in paying quantities.[25] In July 2014, Hall contacted Marion Energy to advise that he intended to take over operations of the seven wells and to ask Marion Energy about releasing its fourteen bottom leases.[26] Marion Energy responded by letter dated July 23, 2014, asserting that it remained "the operator of record of the [seven] wells" and that it continued to "own[] valid and existing oil and gas leases covering" them; Marion Energy also threatened legal action if Hall "attempt[ed] to access the well or exercise any purported lease rights."[27] On October 23, 2014, Hall's attorney sent a letter further outlining Hall's position that Marion Energy's leases were invalid but offering $20,000 in lieu of litigation.[28] Twenty-one days later, Marion Energy's attorney advised Hall's attorney that Marion Energy had completed a sales transaction with a buyer who had taken over operations of the leases and wells at issue and suggested that future correspondence be directed to that new operator, Galmor.[29] Hall subsequently made the same overture to Galmor by letter dated November 21, 2014, offering $20,000 in lieu of litigation, but Hall's overtures went unanswered.[30] Hall then sent Galmor two demand letters pursuant to the Oklahoma Nonjudicial Marketable Title Procedures Act, 12 O.S. Â§Â§ 1141.1 et seq., both of which went unanswered.[31]
Â 
Â¶8 On February 26, 2015, Hall filed this suit against Galmor, seeking to invalidate Galmor's leases, to quiet title in favor of his fifteen top leases, and to recover compensatory and punitive damages for an alleged slander of title.[32] During the discovery phase of litigation, the trial court allowed Galmor to conduct 12-hour tests on the seven wells to ascertain their pressures, insofar as such information might be relevant in determining capability to produce.[33] Before the tests could be performed, six of the wells required repair work, including the removal of obstructions in the production tubing, the removal of a plunger lift, and the installation of pump assemblies.[34]
Â 
Â¶9 During a two-day bench trial on May 4 and 5, 2016, the parties presented seven witnesses and 205 exhibits. Dueling experts in the field of petroleum engineering offered opposing opinions concerning the ability of these wells to produce gas in paying quantities. Hall's title lawyer conceded that he could not say whether the wells were capable of producing and that he therefore could not determine whether the wells were still active or whether the leases were still valid.[35] Galmor's employee, Mike Case, described the tests performed on the wells during litigation and, at the invitation of Hall's attorney, stated his belief that the wells were capable of producing in paying quantities.[36] Galmor also testified that he believed the wells were capable of producing in paying quantities both at the time he inspected the leaseholds in January 2014 and at the time testing was conducted during litigation in October 2015.[37] But perhaps the most convincing testimony was the following exchange between Hall and his attorney:
Â 
Q. . . . Now, in your opinion, do you believe that you could produce seven wells in question here today in -- in paying quantities?

A. It would pay to me.[38]
Â 
Defense counsel reminded the trial court of Hall's testimony during closing argument, and the judge seemingly relied upon this admission in reaching his judgment.[39]
Â 
Â¶10 On May 25, 2016, the trial court issued judgment against Hall on both claims.[40] The trial court relied upon Pack v. Santa Fe Minerals, 1994 OK 23, 869 P.2d 323, providing that a "lease will continue as long as the well is capable of production in paying quantities subject, of course, to any violation of any other express provisions such as the shut-in royalty clause or implied covenants such as the covenant to market."[41] The trial court also relied upon James Energy Co. v. HCG Energy Corp., 1992 OK 117, 847 P.2d 333, providing that "the lessor must demand that an implied covenant be complied with before a court of equity will grant a forfeiture" and that "the lessor, not a stranger to the lease . . . , must make demand on the lessee to comply with the implied covenants."[42] The trial court specifically found that all seven of the wells at issue "were capable of producing in paying quantities during the period they were shut in" and that "no demand to comply with implied covenants was made by the royalty owners to Marion [Energy] or to Galmor."[43] Hall now appeals the judgment, and this Court has retained the appeal.
Â 
II. STANDARD OF REVIEW
Â¶11 Because this is a suit by Hall to cancel certain oil and gas leases belonging to Galmor, it is a matter of equitable cognizance,[44] requiring the application of two standards of review.
Â¶12 We will not reverse the trial court's factual findings or ultimate decision unless they are clearly against the weight of the evidence.[45] "[I]n an equitable proceeding, where the evidence is in conflict, the findings of the trial court will not be set aside unless, after a consideration of the entire record, it appears that such findings are clearly against the weight of the evidence."[46] It is for the trial court in a case of equitable cognizance to determine the credibility of the witnesses and the weight and value to be given to the testimony.[47]
Â 
Â¶13 Issues of law, however, are reviewable by a de novo standard, whereby we possess "plenary, independent, and non-deferential authority to reexamine a trial court's legal rulings." [48]
Â 
III. ANALYSIS AND REVIEW
Â 
Â¶14 In his primary attack upon the trial court's judgment, Hall alleges numerous errors of law and fact related to the trial court's conclusion that Galmor's leases have not expired. Hall also alleges that the trial court erred in failing to quiet title in his favor (1) on the ten leases that did not have completed wells and were not subject to any pooling agreements--leases which Hall calls "Non-Unit Leases"--and (2) on lands outside the 160-acre plots where the seven wells are located--lands which Hall calls "Pugh Clause Lands." We address each of Hall's propositions of error below.
A. Hall's Standing 
Â¶15 As a preliminary matter, we must ascertain whether Hall has standing to challenge the validity of all thirty of the bottom leases that Galmor acquired from Marion Energy.[49]
Â 
Â¶16 The seven gas wells are located on lands covered by fourteen of the thirty bottom leases,[50] which we will refer to as the "Well Leases." Hall obtained fifteen top leases covering all of the same lands except the E/2 of the NW/4 of 16-08N-22W.[51] Consequently, Hall would have standing to challenge the validity of Galmor's fourteen Well Leases and to seek an order quieting title in his favor, although any judgment he obtains could not quiet title to the E/2 of the NW/4 of 16-08N-22W in his favor.
Â 
Â¶17 With respect to the Dalton Counts 1-16 well, the Speed B-4 well, and the Speed 6-B well, the Oklahoma Corporation Commission has issued orders establishing 160-acre drilling and spacing units pursuant to 57 O.S. Â§ 87.1.[52] The lands on which these wells are located are set forth in eleven of the fourteen Well Leases. Ten of those leases cover lands both within and without the 160-acre units;[53] the eleventh lease only covers lands contained within the 160-acre unit.[54] The parties refer to the lands outside the units as "Pugh Clause Lands." Hall obtained eleven top leases covering those same lands.[55] Consequently, Hall has standing to seek an order quieting title to the Pugh Clause Lands in his favor.
Â¶18 Those same eleven top leases obtained by Hall also overlap with ten bottom leases on which wells were never drilled.[56] Hall refers to these ten bottom leases as "Non-Unit Leases," and we will stick with that convention. Insofar as Hall obtained leases covering the same lands, he has standing to challenge the validity of Galmor's ten Non-Unit Leases.
Â¶19 Lastly, of the fourteen Well Leases, two were subject to voluntary pooling agreements with six additional bottom leases on which no wells were drilled. We will call these six leases the "Pooled Leases." Hall, however, did not obtain top leases that overlapped the Pooled Leases. The existence of the Pooled Leases thus does not cloud title to, or otherwise injure the enforceability of, Hall's fifteen top leases to other lands.[57] Hall therefore lacks standing to challenge the validity of the Pooled Leases or to obtain a judgment quieting title in his favor to the lands covered thereby.
Â¶20 The trial court thus did not err in refusing to quiet title to the following lands in favor of Hall: (1) the only tract of land covered by Galmor's Well Leases but not by one of Hall's top leases (i.e., the E/2 of the NW/4 of 16-08N-22W); and (2) any tract of land covered by Galmor's six Pooled Leases (i.e., any portion of 31-08N-22W; any portion of 24-08N-23W; the SW/4 of 25-08N-23W; and any portion of 36-08N-23W). Hall only has standing to allege error in the trial court's refusal to quiet title in his favor as to the remaining lands (i.e., the lands covered by the Well Leases, including the Pugh Clause Lands, and the lands covered by the Non-Unit Leases).
B. Capability
Â¶21 Concerning the Well Leases, Hall contends that the trial court erred in finding that the wells located thereon were capable of production in paying quantities. The viability of a mineral-interest lease depends largely upon whether a well is capable of production in paying quantities, i.e., the characteristic that distinguishes a "shut-in" well from a well experiencing a "cessation of production."[58] The shut-in well is capable of production in paying quantities such that the lease remains viable under the habendum clause, which defines the duration of the lease in relation to the production life of the well.[59] On the other hand, a well that is not capable of production in paying quantities has ceased "production," as we define that term, and the lease is in danger of forfeiture because its habendum clause is not satisfied. Thus, the status of Galmor's wells and the viability of his leases on the underlying land depends upon whether these wells are "capable."
1. The Trial Court Did Not Err in Rejecting Hall's Definition of the Term "Capability"
Â¶22 All of Galmor's bottom leases contain habendum clauses providing that the leases will remain in force for a fixed period of time--i.e., the "primary term" of the lease--and then for so long thereafter as oil or gas continues to be produced--i.e., the "secondary term." Although the word "produced" is typically understood to mean "produced in any quantity," this Court has consistently defined the term to mean "produced in paying quantities,"[60] and has further specified that "paying quantities" means an amount of production "sufficient to yield a profit to the lessee over operating expenses."[61] In the context of cases where the well was not actually producing, we further refined our definition of the term "produced" to mean "capable of producing in paying quantities,"[62] because "[i]t is the ability of the lease to produce that is the important factor rather than actual production applied."[63] Lastly, this Court has repeatedly refused to inject any requirement of marketing into the definition of "produced."[64]
Â 
Â¶23 Hall argues that the trial court erred as a matter of law when it failed to define the legal term "capable" as meaning the well must be maintained in turn-key condition such that it will produce in paying quantities immediately upon being turned "on."
Â 
Â¶24 The definition touted by Hall--and by the amicus curiae who represents mineral owners--was first announced by the Texas Court of Appeals in the case of Hydrocarbon Management, Inc. v. Tracker Exploration, Inc., 861 S.W.2d 427 (Tex. App. 1993). The Texas court defined "capable of production in paying quantities" as meaning "a well that will produce in paying quantities if the well is turned 'on,' and it begins flowing, without additional equipment or repair" and as excluding a "well [that] did not flow [when turned 'on'], because of mechanical problems or because the well needs rods, tubing or pumping equipment."[65] This definition of "capability" was later approved by the Texas Supreme Court in the case of Anadarko Petroleum Corp. v. Thompson, 94 S.W.3d 550, 558 (Tex. 2002). Division I of the Oklahoma Court of Civil Appeals has endorsed Texas's definition of "capability" in an unpublished opinion in the case of Chesapeake Exploration v. Concorde Resources Corp., No. 106,005, slip op. at 4 (Okla. Civ. App. Feb. 27, 2009), cert. denied (Okla. Apr. 27, 2009). Hall's briefing also points out that Texas's definition of "capability" has been adopted by the U.S. Court of Appeals for the Third Circuit and by courts in New Mexico and Ohio.[66]
Â 
Â¶25 On the other hand, Galmor argues we should adopt a more holistic approach to defining "capability," as the Kansas Supreme Court did in the case of Levin v. Maw Oil & Gas, LLC, 234 P.3d 805 (Kan. 2010). The Kansas court "decline[d] . . . to adopt a rigid legal definition of shut-in entirely dependent upon whether dewatering has begun or upon whether equipment or repairs are still needed" and instead stated that "the factors to be considered by the factfinder in determining whether a well is physically complete and capable of producing in paying quantities, i.e., shut-in, are those that affect the properties and potential of the well itself."[67] Division IV of the Oklahoma Court of Civil Appeals adopted Kansas's approach in Concorde Resources Corp. v. Williams Production Mid-Continent Co., 2016 OK CIV APP 37, 379 P.3d 1157, cert. denied (Okla. May 2, 2016), noting that "Hydrocarbon Management, Inc. is contrary to Oklahoma jurisprudence as well as that of other jurisdictions" and holding that "a determination of whether a well is 'capable of producing in paying quantities' involves equitable considerations conducted on a case-by-case basis" that is similar to the method for "examin[ing] the facts and circumstances of [a] cessation on a case-by-case basis."[68]
Â 
Â¶26 Bearing in mind this Court's definition of a "shut-in" well, we decline any rigid definition of the term "capable" that would extend the relevant time period past the moment when the well was shut in. The relevant time period for our consideration is the moment prior to the shutting-in of the well.[69] So long as the well was complete and was producing in paying quantities when it was shut in, the well remains "capable" and the habendum clause in the lease remains satisfied throughout the shut-in period.[70] Thus, we reject Hall's proposed definition that would require operators to continually maintain their shut-in wells in turn-key condition, and hereby affirm the trial court's rejection of the same definition.
Â 
2. The Trial Court Did Not Err in Determining
That the Subject Wells Were "Capable"
Â¶27 Our inquiry as to capability does not end here, however, because Hall contends that the trial court erred as a matter of fact in finding the subject wells were capable of producing in paying quantities when they were shut in. As stated above, we will only reverse the trial court's factual findings if they are clearly against the weight of the evidence.
Â¶28 At trial, the parties presented the following evidence of capability: (1) the historical data demonstrating proven recoverable reserves, (2) the testimony of Galmor's employee, Mike Case, that he believed the wells were all capable of producing in paying quantities; (3) the testimony of Galmor that he believed the wells were capable of producing in paying quantities; (4) the research and opinions of Galmor's petroleum engineering expert, Steve Ramsey, that the wells were capable of producing in paying quantities; (5) the results from the 2015 pressure tests of the wells that showed the wells had enough gas to produce in paying quantities, (6) Galmor's contentions that Hall's petroleum engineering expert, Raymond Roush, used inflated post-production costs and expenses in his calculation of whether the wells were capable of producing in paying quantities; (7) Moseley's testimony that other wells purchased by Galmor from Marion Energy, which are not the subject of this litigation, have performed better since Galmor brought them back into production; (8) the inference to be drawn from Hall's purchase of top leases on these wells that these wells were perfectly good wells that were capable of producing in paying quantities; and, last but not least, (9) Hall's testimony that he could make the wells produce in paying quantities for him. In light of all this evidence, we hold the trial court's finding that the wells were capable of paying production was not against the clear weight of evidence.
Â¶29 Hall mainly contests the trial court's factual finding of capability on the basis that the wells were in disrepair after being shut-in for over four years.[71] Our rejection of Hall's definition of capability, however, disposes of this argument. Evidence of the wells' current or post-shut-in condition is not relevant to whether the wells were capable of paying production on the date of shut-in.[72]
Â 
Â¶30 Hall further argues that it was impossible to determine whether the wells were capable of producing in paying quantities because there were no expense documents produced for any period after 2008.[73] Even so, the trial court was able to rely upon extrapolations from Galmor's expert about the expected expenses and to give such evidence the weight it deserved. Yet Hall also complains about those very extrapolations because Galmor's expert allegedly used inflated production rates, omitted production data for the months of June and July 2011, and used unreliable pressure data.[74] These perceived problems with the expert's accounting and opinions were addressed during Hall's direct and cross-examination of the expert, and the trial court was entitled to weigh the credibility and reliability of the expert's testimony.
Â 
Â¶31 Lastly, Hall argues for the first time in his appellate reply brief that Marion Energy essentially admitted the leases were invalid when it drastically reduced the sales price for the leases and wells from $2,000,000 to $200,000. In light of Marion Energy's continued insistence as late as July of 2014 that its leases were valid,[75] it is just as likely that the price reduction was made due to Marion Energy's impending bankruptcy,[76] rather than some realization that the leases were invalid. Regardless, this is a new argument not advanced at trial and, consequently, not preserved for appeal.[77]
Â 
Â¶32 Having considered all the evidence, the trial court found that the wells were capable of producing in paying quantities, and we cannot say that finding is against the clear weight of evidence.
Â 
3. Capability Satisfies the Habendum Clauses and
Cessation-of-Production Clauses
Â¶33 Seeking to avoid the trial court's determination that the wells were capable of producing in paying quantities, Hall attempts to recharacterize the shutting-in as a "cessation of production" that triggered the expiration of the leases' various habendum clauses. But our affirmation of the trial court's finding of capability prevents Hall from saying "production" ceased because, as previously noted, we define the term "production" as meaning "capable of producing in paying quantities."[78] If the wells are capable of paying production, then they must be considered producing wells, and the habendum clauses permitting the leases to continue "for so long . . . as oil or gas continues to be produced" have not been breached. Thus, the trial court did not err in finding that the Well Leases were still viable.
Â¶34 By extension, Hall's argument that it was error for the trial court not to invalidate the subject leases under their respective cessation-of-production clauses is not well taken. In essence, Hall argues that there was no production from the subject wells between August 2011 and May 2014, which far exceeded the 60-day to 6-month grace periods set forth in the cessation-of-production clauses of the various leases. This argument has at least two problems.
Â¶35 First, cessation-of-production clauses only serve to "modify the habendum clause[s] and to extend or preserve the lease[s] while the lessee resumes operations designed to restore production."[79] Where the law (by operation of the temporary cessation doctrine) would ordinarily give a lessee a "reasonable" amount of time in which to restore production,[80] the cessation-of-production clause substitutes a bargained-for period of time that cannot be altered by any court's notion of reasonableness.[81] Thus, the main function of a cessation-of-production clause is to serve as a savings clause of sorts that prevents automatic termination of the lease under its habendum clause; if a lease terminates, it terminates by operation of its habendum clause after expiration of the grace-period contained in its cessation-of-production clause.[82] Consequently, the cessation-of-production clauses in the Well Leases cannot serve as the basis for terminating any of those leases.
Â¶36 Second, Hall cannot establish "production" has ceased such that the cessation-of-production clauses would be implicated here. "[O]ur understanding of the term in the cessation of production clause is influenced by how we have interpreted it in other provisions of oil and gas leases such as the habendum clause. . . . The term 'production' as used in the cessation of production clause must mean the same as that term means in the habendum clause."[83] Consequently, in the context of a cessation-of-production clause, the term "production" means "production in paying quantities" for an active well and "capable of production in paying quantities" for a shut-in well.[84] Using this definition of the term "production," capability of production in paying quantities satisfies not only the habendum clause but also the cessation-of-production clause.[85] "[T]he express provisions of the cessation of production clause . . . are [only] intended to come into play in the event that production from the well shall cease, i.e., the well becomes incapable of producing in paying quantities."[86] Our affirmation of the trial court's finding that the subject wells were capable of paying production leads us to conclude that "production" never ceased, that the cessation-of-production clauses were therefore never implicated, and that the trial court's failure to terminate the Well Leases under the terms of their respective cessation-of-production clauses was not error.
Â¶37 Our rejection of Hall's argument that the Well Leases terminated under their express terms should come as no surprise. Since this Court's decision in Pack v. Santa Fe Minerals, 1994 OK 23, 869 P.2d 323, it has been clear that a well's capability to produce in paying quantities would satisfy both the habendum clause and the cessation-of-production clause and that the cessation-of-production clause is only triggered where a well has become incapable of paying production.[87]
Â 
Â¶38 Nevertheless, Hall argues for the opposite result, relying heavily upon the Oklahoma Court of Civil Appeals' opinion in Fisher v. Grace Petroleum Corp., 1991 OK CIV APP 112, 830 P.2d 1380.[88] Citing Fisher, Hall voices concern that an affirmance of the trial court's judgment would signal to "Oklahoma lessees that a well capable of producing in paying quantities can sit without any actual production for an indefinite period of time, thus rendering the bargained-for cessation of production time restraints null."[89]
Â 
Â¶39 Hall's reliance upon Fisher is misplaced for two reasons. First, this Court's ruling in the Pack case came three years after Fisher and signaled a departure from the Fisher court's approach.[90] Whereas the Fisher court held that "physical capability alone" would not maintain a lease and opined that a contrary holding would "render temporary cessation clauses superfluous,"[91] this Court held that capability would maintain a lease for purposes of both the habendum clause and the cessation-of-production clause and opined that "[a]ny other conclusion would render the habendum clause useless" and "the shut-in royalty clause . . . meaningless."[92] Second, and more to the point of Hall's arguments, a lessor could always avoid an "indefinite" shut-in by seeking to enforce payments under the shut-in royalty clause (although it is worth noting that "failure to pay shut-in royalties in and of itself [will] not operate to cause a termination of the lease"),[93] or by making a written demand for compliance with the implied covenant to market (which would force the lessee to pump gas out of the ground and market it or else face the possibility of lease cancellation).[94] Either way, the lessor can force the lessee to do something that will give the lessor value out of the lease. In the end, Hall's arguments and the Fisher court's reasoning do not change our holding that the Well Leases have not terminated under the terms found in their habendum and cessation-of-production clauses.
Â 
C. The Trial Court's Review of Whether the Implied Covenant to Market Was Breached Was Not Error
Â¶40 Next, we address Hall's contention that the trial court recharacterized his claim for breach of the express lease terms (i.e., the habendum and cessation-of-production clauses) as a claim for breach of the implied covenant to market and conflated the jurisprudence related to both types of claims, thereby erring as a matter of law.[95] Hall then points to those portions of the trial court's order discussing James Energy Co. v. HCG Energy Corp., 1992 OK 117, 847 P.2d 333, and its requirement that "the lessor must demand that an implied covenant be complied with before a court of equity will grant a forfeiture" and then finding that no lessors had ever demanded that Marion Energy or Galmor comply with the implied covenant to market.[96] To Hall, all of this demonstrates an apparent inconsistency evidencing the trial court's confusion about the legal issues in the case.
Â¶41 Hall, however, either misunderstands or has chosen to ignore the remainder of the trial court's ruling. As discussed above,[97] those portions of the trial court's order discussing the Pack case and concluding that the wells were capable of paying production disposed of Hall's claims that the habendum and cessation-of-production clauses were breached.[98]
Â 
Â¶42 The trial court understood the issues presented by Hall, addressed his claims for breach of the express lease terms by finding that the wells were capable of paying production, and then logically proceeded to an analysis of whether the leases could be canceled for breach of any other express provisions or implied covenants, as the Pack case cued the trial court to do.[99] Hence the trial court looked to case law governing the implied covenant to market, assessed whether the leases could be canceled due to breach of that covenant on either Marion Energy's or Galmor's part, and correctly found the leases could not be canceled because the James Energy case's prerequisite for a demand to market made by the lessors had not been met. This doesn't demonstrate legal error on the trial court's part; it demonstrates thoroughness.
Â 
D. The Trial Court Erred in Failing to Quiet Title to the Pugh Clause Lands in Hall's Favor
Â¶43 For his next proposition of error, Hall asserts the trial court erred in failing to quiet title to the Pugh Clause Lands in his favor. He essentially argues that Oklahoma's statutory Pugh clause at 52 O.S. Â§ 87.1(b) required the trial court to invalidate Galmor's interest in the Pugh Clause Lands--i.e., those portions of leased lands falling outside the two 160-acre spacing units that encompass the Dalton Counts 1-16 well and the Speed B-4 and Speed 6-B wells--even if such lands would otherwise be held under the terms of a Well Lease by production from a well located on the portion of the leased premises falling inside the spacing unit. According to Hall, section 87.1(b) would permit Galmor to retain the Pugh Clause Lands only if a producing well had been drilled on them within a 90-day grace period following expiration of the Well Lease's primary term, which didn't happen. The ten Well Leases at issue were signed between April 27, 1990, and September 20, 2007,[100] and the last primary term to expire did so on September 20, 2010.[101] Hence, Hall argues all of the Pugh Clause Lands should have reverted back to the lessors no later than December 19, 2010 (i.e., ninety days after September 20, 2010), such that Galmor's Well Leases would not create any cloud on the top leases that Hall obtained from the landowners in 2014.
Â¶44 Galmor counters with several arguments. First, Galmor claims that section 87.1(b) is susceptible to a different interpretation and should be so read because Hall's interpretation defeats that section's purposes of resource conservation, as evidence by the authorization of spacing units, and of correlative rights, as evidence by the equitable apportionment of royalties. Second, Galmor argues that, if section 87.1(b) is applied to cancel his leasehold interests in portions of the Well Leases lying outside the spacing units, the cancellation would constitute a taking for private use in violation of Article II, Section 23 of the Oklahoma Constitution. Third, Galmor asserts that the title of the statutory amendment adding section 87.1(b) violated Article V, Section 57 of the Oklahoma Constitution because it did not provide an adequate description of the subject matter contained in subpart (b).
1. Discerning the Meaning of Oklahoma's Statutory Pugh Clause
Â¶45 Before we can address Galmor's constitutional challenges, we must first determine the meaning of section 87.1(b). This inquiry begins with the text of the statute and--absent unresolvable ambiguity--ends with the text. Our task is to determine the ordinary meaning of the words that the Legislature chose in the provisions of law at issue.[102] In ascertaining meaning, we look not just at the text of the provision at issue, but also at the text of related provisions in the same statute or legislative act,[103] in a manner that achieves full force and effect for each provision.[104]
Â 
Â¶46 Since its addition to section 87.1 in 1977, subpart (b) has provided: "In case of a spacing unit of one hundred sixty (160) acres or more, no oil and/or gas leasehold interest outside the spacing unit involved may be held by production from the spacing unit more than ninety (90) days beyond expiration of the primary term of the lease."[105] The plain language of this provision is susceptible to two interpretations. These two interpretations are perhaps best summarized by the late Professor Eugene Kuntz, who wrote a law review article in 1978 about the amendment to section 87.1 that, in part, added subpart (b):
Â 
On the one hand, the language "no oil and/or gas leasehold interest outside the spacing unit involved may be held by production from the spacing unit" is capable of being construed to apply only where the well is not located on the leased premises, on the reasoning that where there is production from the lease, production from the unit is not required to satisfy the habendum clause. However, this language is also capable of being construed to apply regardless of whether the well is located on the leased premises because production from such a well is "production from the spacing unit."
Eugene Kuntz, Statutory Well Spacing and Drilling Units, 31 Okla. L. Rev. 344, 352 (1978). Given this alleged ambiguity, we examine contextual indicators of the Legislature's objective in enacting the amendment.
Â¶47 Prior to the enactment of subpart (b), this Court's case law determined the viability of leasehold interests that fell outside drilling and spacing units created by the Oklahoma Corporation Commission pursuant to section 87.1. This Court had judicially determined that, when a spacing unit included only a portion of a leased premises, production from a well inside the unit would satisfy the habendum clause of the lease as to both the part of the leased premises inside the unit and the part of the leased premises outside the unit.[106] Further, this Court had resolved that production from the unit would satisfy the habendum clause of the lease regardless of whether the unit well was located on that lease or elsewhere in the unit.[107] In other words, the location of the well within the unit was not significant; production from the well could hold all the lands inside and outside the spacing unit for every lease included in the spacing unit.
Â¶48 This operation of the law had adverse economic consequences that were objectionable to lessors whose land was included in a spacing unit with other land.[108] By statute each lessor received only a pro rata share of the royalties for any production from a unit well,[109] even though the entire lease was extended by the unit well's production.[110] Moreover, lessors faced this problem regardless of the producing well's location within the unit.[111] Thus, the lessee got the extension of all leasehold rights for which it bargained--sometimes as a result of the drilling efforts of a different lessee upon a different lease in the unit--while the lessor received only a fraction of the royalties for which he or she bargained.
Â¶49 By way of example, assume half of a 240-acre lease (i.e., a 120-acre portion) was included with someone else's land in a 160-acre spacing unit. A producing well located in the unit on the 40 acres belonging to someone else (Scenario A, below) would have entitled the lessor of the 120-acre tract to only 75% of any royalties due, even though the well preserved 100% of the 240-acre lease. If the producing well was instead located on the 120 acres belonging to the lessor (Scenario B, below), the result would have been identical. In both scenarios, the lessor did not get the full benefit of his bargain. The lessor's problem of adverse economic consequences needed a solution that would result in forfeiture of leasehold interests outside the spacing unit even if the unit well was located on the lessor's lease. If both a lessor on whose land there was no unit well and a lessor on whose land there was a unit well suffered from adverse economic consequences, then both lessors were in need of relief from the Legislature. Defining the scope of the problem in this way reveals the objective of the Legislature in adding subpart (b).
Scenario A 
Scenario B
Â¶50 Section 87.1(b) was meant to extinguish all leasehold interests falling outside the spacing unit, even those that would normally be held by the lease's habendum clause. Subpart (b) was designed to overcome in part the effect of this Court's judicial determinations that negatively affected lessors by changing the applicable legal rule as to the portion of the leased premises falling outside the spacing unit when said unit was comprised of at least 160 acres.[112]
Â 
Â¶51 The meaning of the statute becomes even more manifest when we review the materials cited by Hall. In the case of Wickham v. Gulf Oil Corp., 1981 OK 8, 623 P.2d 613, this Court stated, "As a result of Section 87.1(b), leased lands lying outside of the spacing unit would no longer be held by production over ninety days beyond the expiration of the primary term of the lease--a departure from the previous law that the production of oil and gas in commercial quantities from any part of the leased premises during the primary term extended the lease not only as to the acreage committed to the drilling and spacing unit but also as to the lands lying outside of the unit area."[113] This statement of legislative purpose came a mere four years after the addition of subpart (b) and lacks any equivocation or qualification. Similarly, in the case of Siniard v. Davis, 1984 OK CIV APP 13, 678 P.2d 1197, the Court of Civil Appeals stated, "Section 87.1(b) has the purpose of preventing production from a unit from satisfying the habendum clause of any lease for more than ninety days beyond the expiration of the primary term as to acreage outside of the unit when a part of the leased premises is included in a unit of 160 acres or more."[114] Lastly, a Report of the Oil and Gas Appellate Referee from an Oklahoma Corporation Commission matter, In re Application of Sandridge Exploration & Production, L.L.C. for Drilling & Spacing Units, No. CD-201101938, gives some insight into how the Corporation Commission interprets section 87.1(b): "[T]he Statutory Pugh Clause . . . is a provision dealing with correlative rights. The Statutory Pugh Clause addresses a situation where if a farmer owned an interest in three or four sections and his lease covered all of those sections one well in one of those sections would hold all of that acreage in the other sections. That's what the Statutory Pugh Clause was designed to address; in cases of spacing units of 160 acres or more, you will have 90 days after the expiration of the primary term of the lease to develop these lands outside the spacing unit. If you do not do so, the lease would expire."[115] Although none of these statements has precedential value, they confirm our understanding of the meaning of section 87.1(b).
Â 
2. Galmor's Policy Arguments Do Not Overcome Our
Interpretation of the Statutory Pugh Clause
Â¶52 Galmor attempts to resist our interpretation of section 87.1(b) by pointing out that its application to his leases would actually defeat the purposes of resource conservation and correlative rights that the rest of section 87.1 advances through the authorization of spacing units and through the equitable apportionment of royalties. Galmor acknowledges that, "[w]here separately owned tracts are included in the unit boundary, Section 87.1(b) provides relief to each owner to the extent of any lands outside the unit"; but he argues there is no relief needed "where the unit boundaries embrace only the leased premises."[116] Professor Kuntz made the same observations:
The objectionable feature with which the amendment deals is the economic consequences to the lessor when a part of the leased premises is included in a unit with other land. The lessor receives royalty only on a portion of the production from a unit well, yet the production serves to hold the entire leased premises. This objection is present whether the unit well is located on the leased premises or is located on other land in the unit. However, where no other land is included in the unit, such objection is not present. For example, if a lease should be granted on a section of land and drilling units of 160 acres should be established in that area, it would be unreasonable to conclude that production from a unit which included no other land other than a part of the leased premises does not satisfy the habendum clause as to the entire section of land. Such a conclusion would attribute too much to the purpose of an amendment to a conservation statute because conservation and protection of correlative rights are not thereby served.
Kuntz, supra note 108, at 352 (emphasis added). Galmor's reason for making this argument centers upon the same analysis of equities we performed above while discussing section 87.1(b)'s objective.[117]
Â 
Â¶53 Where a spacing unit covers a portion of a larger lease (Scenario C, below), there is only one lessor who will receive royalties from any producing well drilled within the unit; thus, that lessor is reaping 100% of the benefit for which he bargained. Prior to 87.1(b), the habendum clause of the lease was satisfied by the producing unit well, and the lessee also reaped the full benefit of his bargain. In this scenario, the equities were in balance. But if we interpret section 87.1(b) as canceling those leasehold interests outside the spacing unit, the lessee is reaping only a fraction of the benefits for which he bargained, and the equities are thrown out of balance. Besides this, whether a lessee complies with the terms of 87.1(b) or fails to do so, the result is more wells, which seemingly goes against the whole notion of conservation. As couched by Galmor, this seems like a dilemma.
Â 
Scenario C

Â¶54 But even if Galmor and Professor Kuntz have a legitimate criticism of the Legislature's policy, we cannot accommodate those policy concerns by reading into the statute an exception that appears nowhere in its text.[118] Section 87.1(b) was meant to prevent a unit well's production from satisfying the habendum clause of any lease for more than ninety days beyond the expiration of the primary term as to acreage outside of the unit when the leased premises, or any portion thereof, is included in a unit of 160 acres or more.
Â¶55 In light of our interpretation of section 87.1(b), production from the Dalton Counts 1-16 well and the Speed B-4 and Speed 6-B wells cannot satisfy the habendum clauses of the ten Well Leases at issue as to the Pugh Clause Lands lying outside the spacing units. Consequently, Galmor's leasehold interests in the Pugh Clause Lands should be forfeited, unless he can demonstrate that section 87.1(b) is somehow unconstitutional.
3. The Statutory Pugh Clause Does Not Effect a Taking for Private Use in Violation of Article II, Section 23 of the Oklahoma Constitution 
Â¶56 Galmor further attempts to resist our interpretation of section 87.1(b) by arguing it results in an unconstitutional taking of his property for private use, in violation of Article II, Section 23 of the Oklahoma Constitution.[119] Galmor borrows this argument from Professor Kuntz, who believed that "the amendment [i.e., Senate Bill No. 7 that, among other things, added subpart (b)] would be unconstitutional if applied to an existing lease, regardless of whether it is held by production from a unit."[120] But Galmor attempts to extend Kuntz's argument to cover any and every lease--even leases granted after the effective date of the amendment (i.e., May 25, 1977).
Â¶57 Hall tries to short-circuit our analysis of this issue by suggesting that we already decided it in his favor in the Wickham case. But in Wickham, we merely determined that section 87.1(b) did not apply retroactively and could not apply retroactively because of the constitutional problems its retroactive application would create.[121] Although the opinion discussed a "presumption of prospective operation" for section 87.1(b),[122] the Court's holding simply stated that such presumption led to "a determination that the section d[id] not apply [retroactively] to the 1967 Wickham lease."[123] The Court did not address the constitutionality of the statute as applied prospectively. Thus, the issue cannot be avoided for this reason.
Â¶58 In any event, Galmor fails to explain how prospective application of a statute like this would result in a taking. He merely tenders the issue and provides cursory analysis in four sentences, citing only two cases that concern distinguishable takings claims and one case that stands for the general proposition that equity abhors a forfeiture.[124] While retroactive application of section 87.1(b) may well be problematic, when applied prospectively there is no taking.[125]
Â 
Â¶59 Most takings claims involve outright confiscation of property, like that observed in a condemnation action, or some restriction on the use and enjoyment of property, like what happens in a regulatory takings case. Section 87.1(b) does neither. It simply places a time limitation upon the lessee's ability to hold a lease on Pugh Clause Lands without drilling a well thereon.
Â 
Â¶60 As such, section 87.1(b) is a reasonable regulation that addressed the lessors' problem of negative economic consequences resulting from the inclusion of their land in a spacing unit with a solution that permitted any unused leasehold interests belonging to their lessees to revert back to them after the passage of time. "States have the power to permit unused or abandoned interests in property to revert to another after the passage of time."[126] As a reasonable exercise of the Legislature's police power, section 87.1(b) does not violate the takings clause in Article II, Section 23.[127]
Â 
4. The Title of the Bill Enacting the Statutory Pugh Clause Did Not Violate
Article V, Section 57 of the Oklahoma Constitution 
Â 
Â¶61 Galmor also claims that the enactment of section 87.1(b) violated Article V, Section 57 of the Oklahoma Constitution due to an alleged defect in the bill title.
Â¶62 Article V, Section 57 requires "[e]very act of the Legislature . . . , except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes" to "embrace but one subject, which shall be clearly expressed in its title."[128] If a legislative act embraces any subject that is not contained in the title, the act "shall be void only as to so much of the law as may not be expressed in the title thereof."[129]
Â 
Â¶63 Turning to the bill at hand, the issue is whether the portion of the bill's title describing it as "[a]n act . . . imposing certain time limitations" is a constitutionally sufficient description of the statutory Pugh clause contained in subpart (b). [130]
Â 
Â¶64 Our case law interpreting Article V, Section 57 clearly states that it should not be enforced in a technical manner, so as to unreasonably cripple legislation.[131] The title must be given a liberal construction: "If the words used in a title, taken in any sense or meaning they will bear, are sufficient to cover the provisions of the act, the act will be sustained, even though such meaning may not be the most common meaning of such words."[132] Furthermore, a bill's title need not be a summary or abstract of the statute's content; "there is no need of expressing the details or subdivisions in the title."[133]
Â 
Â¶65 In light of these guiding principles, we hold that the portion of Senate Bill No. 7's title referencing the "imposi[tion of] certain time limitations" is an adequate description of the subject matter contained in section 87.1(b). Galmor argues the subject matter of subpart (b) concerns "imposing a restriction on the right of private parties to contract concerning their mineral interests or a cancellation of valuable leasehold rights under any circumstance" and that the bill's title fails to reference any such provision.[134] But while the Legislature could have described the contents of subpart (b) in other terms--perhaps even terms that satisfy Galmor's preferences--the Legislature need not craft the "perfect" title. Laying aside alternatives, we think the bill's actual title describing the content of subpart (b) as "imposing certain time limitations" is sufficient, because that is exactly what section 87.1(b) does.[135] Section 87.1(b) was thus not enacted in violation of Article V, Section 57 of the Oklahoma Constitution.
Â 
* * *
Â¶66 In light of our interpretation of section 87.1(b) and our determinations that its enactment did not violate Article V, Section 57 of the Oklahoma Constitution and that its prospective application to leases executed after its effective date did not violate Article II, Section 23 of the Oklahoma Constitution, we conclude the trial court erred in failing to quiet title to the Pugh Clause Lands in favor of Hall.
E. The Trial Court Erred in Failing to Quiet Title in Hall's
Favor to Lands Covered by Galmor's Non-Unit Leases
Â¶67 Having addressed Hall's arguments concerning the lands covered by the Well Leases, including the Pugh Clause Lands, we turn now to his last proposition of error. Hall asserts the trial court erred by quieting title in Galmor to lands covered by the Non-Unit Leases. The Non-Unit Leases were ten bottom leases covering lands in the NE/4 of 16-08N-22W and in the NW/4 and E/2 of 13-08N-23W on which no well has ever been drilled, either by Galmor or by his predecessors.[136]
Â 
Â¶68 Galmor's Non-Unit Leases contain habendum clauses providing that the leases will remain in force for a primary term of either 7 months or 3 years, and then for a secondary term that continues so long as oil or gas continues to be produced.[137] The Non-Unit Leases were signed between March 30, 2007, and January 14, 2008,[138] and the last primary term to expire did so on January 10, 2011.[139] No wells were ever drilled, and there was no evidence presented showing that such lands had been included in a spacing unit or a pooling agreement.
Â 
Â¶69 Under the express and unequivocal terms of the Non-Unit Leases, the habendum clauses for these leases were not satisfied. Galmor's leasehold rights to the lands terminated upon expiration of the Non-Unit Leases' respective primary terms.[140] It was thus error for the trial court to quiet title to such lands in Galmor.
IV. CONCLUSION
Â¶70 For the reasons set forth above, this Court declines to adopt the rigid definition of "capability" propounded by Hall. We affirm the trial court's determination that the subject wells were capable of producing in paying quantities, and hold that Galmor's bottom Well Leases remain valid, except as affected by the statutory Pugh clause. We find that application of the statutory Pugh clause in this case should result in termination of those portions of Galmor's bottom Well Leases that fall outside a spacing unit, and that title to such "Pugh Clause Lands" should be quieted in favor of Hall due to his top leases covering those lands. We further hold that the enactment of the statutory Pugh clause found in 52 O.S. Â§ 87.1(b) did not violate Article V, Section 57 of the Oklahoma Constitution and that application of the statutory Pugh clause upon Galmor's leasehold interests is not an unconstitutional taking in violation of Article II, Section 23 of the Oklahoma Constitution. We also find that Galmor's Non-Unit Leases terminated as a result of failure to drill any wells, and that title to the lands covered thereby should be quieted in favor of Hall due to his top leases covering those lands. Lastly, we find that Hall lacks standing to challenge the validity of the Galmor's "Pooled Leases" or to obtain a judgment quieting title in his favor to the lands covered thereby. Accordingly, the judgment of the trial court is affirmed in part and reversed in part. Insofar as we reverse judgment on Hall's quiet title claims concerning the Pugh Clause Lands and lands covered by the Non-Unit Leases, we also vacate that portion of the judgment denying his cause of action for slander of title as to those lands. We remand the case with instructions to conduct further proceedings in a manner consistent with this opinion.

Gurich, V.C.J., and Winchester, Edmondson, Colbert, Reif, Wyrick, and Darby, JJ., concur.
Combs, C.J., and Kauger, J., concur in the result.

FOOTNOTES

[1] The precise location of the lands at issue in this case are as follows:

a) the 560-acre lot contained in the eastern half of the northwest corner, the northeast corner, and the south half of Section 16, Township 8 North, Range 22 West (i.e., in abbreviated form: E/2 NW/4, NE/4, and S/2 of 16-08N-22W);
b) the 640-acre lot contained in 13-08N-23W;
c) the 560-acre lot contained in S/2 NE/4, NW/4, and S/2 of 24-08N-23W;
d) the 640-acre lot contained in 25-08N-23W;
e) the 320-acre lot contained in E/2 of 36-08N-23W; and
f) the 160-acre lot contained in NW/4 of 31-08N-22W.

[2] Sixteen of the leases contained the following language in their cessation-of-production clauses:
If at, or after, the expiration of the primary term oil or gas is not being produced on the leased premises, but Lessee is then engaged in operations thereon as provided herein, this Lease shall remain in force so long as operations are prosecuted (whether on the same or successive wells) with no cessation of more than ninety (90) days, and, if production results therefrom, then as long as production is maintained pursuant to the terms hereof.
ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 4-8, 10-15, 17, 58-61; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 47-50, 52-61, 63, 65. Ten of the leases contained this cessation-of-production clause:
Notwithstanding any contrary provision, if lessee commences mining, drilling or reworking operations on said land or on a consolidated gas leasehold estate at any time while this lease is in force, this lease shall remain in force as provided by any provision hereof and for any longer time during which such operations, or any additional operations, are prosecuted with no cessation of more than sixty consecutive days and, if production results therefrom, as long as production continues or this lease is maintained in force under any provision hereof.
ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 38, 40, 55-57, 78-82; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 37-46. Two of the leases had addendums containing the following cessation-of-production clauses, which took precedence over their counterparts contained in the leases:
CESSATION, DRILLING AND REWORKING: In the event production in paying quantities of oil or gas on the leases [sic] premises, after once obtained, shall cease for any cause within sixty (60) days before the expiration of the primary term of this lease or at any time or times thereafter, this lease shall not terminate if the Lessee commences additional drilling or reworking operations within sixty (60) days after such cessation, and this lease shall remain in full force and effect so long as such operations continue in good faith and workmanlike manner without interruptions totaling more than sixty (60) days during any one such operation; and if such drilling or reworking operations result in the production of oil or gas in paying quantities, this lease shall remain in full force and effect so long as oil or gas is produced in paying quantities or payment of shut-in gas well royalties are made as hereinbefore provided in the lease.
ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 9, 16; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 62, 64. Finally, one lease contained the following cessation-of-production clause:
Should production from the above described land, or from acreage pooled therewith, cease from any cause after the expiration of the primary term this lease shall not terminate provided lessee succeeds in bringing back such production within six (6) months from such cessation, or within such six (6) month period commences drilling another well on the above described land or on land pooled therewith, and prosecutes the drilling thereof with due diligence to completion, and if such production is restored through any such operations this lease shall continue with the like effect as if there had been no cessation thereof.
ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Ex. 39; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Ex. 36. The one lease that did not have a cessation-of-production clause was the oldest of the leases, dating back to 1954; it only contained a dry hole clause. See ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Ex. 3; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Ex. 51.

[3] The Denby 2 well was completed in May 1960 in the SW/4 of 16-08N-22W. The G.S. Spencer 1 well was completed in June 1967 in the SE/4 of 25-08N-23W, and the R.B. Jordan 1 well was completed in August of the same year in the NE/4 of the same section. The R.B. Jordan 2 well was completed in July 1974 in the NW/4 of 25-08N-23W. The Speed B-4 well was completed in August 1986 in the SW/4 of 13-08N-23W. In December 2007, the Speed 6-B well was completed in the SW/4 of 13-08N-23W, and the Dalton Counts 1-16 well was completed in the SE/4 of 16-08N-22W. ROA, Doc. 1307, Tr.Vol.II at 186:8-195:11; ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 19, 42-44, 63-64.

[4] See generally ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 3-11, 38-39, 55-57 (comprising the leases that cover the lands mentioned in footnote 3, supra); ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 36, 43-46, 51-56, 58, 64-65 (same).

[5] The lands covered by those six leases were located in the W/2, the S/2 of the NE/4, and the SE/4 of 24-08N-23W; in the SW/4 of 25-08N-23W; in the E/2 of 36-08N-23W; and in the NW/4 of 31-08N-22W. See ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Ex. 83 (pooling the lease found at Plaintiff's Exhibit 38 (a/k/a Defendant's Exhibit 43) with the leases found at Plaintiff's Exhibits 81 and 82 (a/k/a Defendant's Exhibits 41 and 42)); id. at Pl.'s Ex. 84 (pooling the lease found at Plaintiff's Exhibit 39 (a/k/a Defendant's Exhibit 36) with the leases found at Plaintiff's Exhibits 78, 79, and 80 (a/k/a Defendant's Exhibits 38, 39, and 40)); id. at Pl.'s Ex. 105 (found in the ROA immediately following Plaintiff's Exhibit 83) (pooling the lease found at Plaintiff's Exhibit 39 (a/k/a Defendant's Exhibit 36) with the lease found at Plaintiff's Exhibit 40 (a/k/a Defendant's Exhibit 37)).

[6] See ROA, Doc. 1306, Tr.Vol.I at 44:17-48:11, 94:5-97:2; ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 12-17, 58-61; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 47-50, 57, 59-63. That's not to say these lands were devoid of any valid leasehold interests. For example, even though six of these ten leases covered lands with no well that were located exclusively in the NE/4 of 16-08N-22W, see ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 12-17, seven leases with a well located in the SE/4 of 16-08N-22W also covered lands located in the NE/4 of 16-08N-22W, see id. at Pl.'s Exs. 4-8, 10-11.

[7] The Denby 2 well produced and marketed 1,253,812 Mcf of natural gas between May 1960 and August 2011; the G.S. Spencer 1 well produced and marketed 315,970 Mcf of natural gas between June 1967 and August 2011; the R.B. Jordan 1 well produced and marketed 402,731 Mcf of natural gas between August 1967 and August 2011; the R.B. Jordan 2 well produced and marketed 239,203 Mcf of natural gas between July 1974 and August 2011; the Speed B-4 well produced and marketed 158,388 Mcf of natural gas between August 1986 and August 2011; and the Speed 6-B well produced and marketed 95,142 Mcf of natural gas between December 2007 and January 2012 and 321 barrels of oil between December 2007 and July 2009. ROA, Doc. 1307, Tr.Vol.II at 186:8-196:2; ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 19, 42-44, 63-64.

[8] ROA, Doc. 1308, Tr.Vol.III at 431:7-:20; see also ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 19, 42-44, 63 (revealing that this trial testimony may have only been true as it relates to the Denby 2 well).

[9] ROA, Doc. 1307, Tr.Vol.II at 186:8-196:2; ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 19, 42-44, 63-64.

[10] ROA, p.1304, Decision on the Merits at 2.

[11] ROA, Doc. 1308, Tr.Vol.III at 432:10-436:21, 460:10-461:14, 727:22-728:6; accord id. at 614:24-615:4 (wherein Appellee's expert witness testified that "the wells shut in because they came and got the compressors," which he thought "had to do with--with Marion paying their bills"); Appellant's Br. 18 (characterizing the taking of the compressors as a "repossess[ion]").

[12] ROA, Doc. 1307, Tr.Vol.II at 190:22-191:24; ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Ex. 20.

[13] See ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 4-11; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 52-56, 58, 64-65.

[14] See ROA, p.1304, Decision on the Merits at 2.

[15] ROA, Doc. 1308, Tr.Vol.III at 672:6-673:2.

[16] ROA, Doc. 1307, Tr.Vol.II at 339:19-341:10.

[17] Id. at 377:8-378:10.

[18] See ROA, Doc. 1308, Tr.Vol.III at 673:7-:21 (stating that the asking price had been lowered for Galmor in January 2014); ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 77-78 (suggesting that the asking price had been lowered for Triple "S" Gas in February 2014).

[19] ROA, Doc. 1308, Tr.Vol.III at 673:22-678:4; accord id. at 437:23-438:8, 449:23-452:8.

[20] ROA, Doc. 1307, Tr.Vol.II at 345:5-346:16, 378:1-:10.

[21] ROA, Doc. 1310, Tr.Vol.V at Pl.'s Ex. 97; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 80-81; see also ROA, Doc. 1307, Tr.Vol.II at 345:5-349:1 (containing Bo Hall's explanation at trial for why he decided not to purchase Marion Energy's assets); ROA, Doc. 1311, Tr.Vol.VI at Def.'s Ex. 80 (an e-mail offering the same basic explanation as the quoted letter).

[22] ROA, Doc. 1308, Tr.Vol.III at 677:12-678:9; ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Ex. 28; ROA Doc. 1311, TrVol.VI at Def.'s Exs. 1, 66.

[23] ROA, Doc. 1307, Tr.Vol.II at 349:3-352:3, 392:4-394:8 (admitting that negotiations for top leases probably began in April 2014); ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 21-27, 45-48, 65-68.

[24] ROA, p.1304, Decision on the Merits at 2.

[25] Id. (wherein the trial court stated as follows: "However, plaintiff did discuss the proximity of the wells to his other producing interests. That suggested to me he thought the wells could be producing in paying quantities for him."); ROA, Doc. 1307, Tr.Vol.II at 373:2-:5 (wherein Hall was asked at trial whether he "believe[d] that [he] could produce seven wells in question here today in--in paying quantities" and he responded that the wells "would pay to [him]").

[26] ROA, Doc. 1307, Tr.Vol.II at 352:5-353:5, 394:10-395:3; see also ROA, Doc. 1310, Tr.Vol.V at Pl.'s Ex. 99; ROA, Doc. 1312, Tr.Vol.VII at Def.'s Ex. 83.

[27] ROA, Doc. 1307, Tr.Vol.II at 353:6-354:21; ROA, Doc. 1310, Tr.Vol.V at Pl.'s Ex. 99; ROA, Doc. 1312, Tr.Vol.VII at Def.'s Ex. 83.

[28] ROA, Doc. 1307, Tr.Vol.II at 354:22-358:17, 396:14-397:18; ROA, Doc. 1310, Tr.Vol.V at Pl.'s Ex. 100; ROA, Doc. 1312, Tr.Vol.VII at Def.'s Exs. 84-85.

[29] ROA, Doc. 1307, Tr.Vol.II at 359:4-361:2, 397:24-398:1; ROA, Doc. 1310, Tr.Vol.V at Pl.'s Ex. 101; ROA, Doc. 1312, Tr.Vol.VII at Def.'s Ex. 86.

[30] ROA, Doc. 1307, Tr.Vol.II at 361:3-363:20, 402:22-404:1; ROA, Doc. 1310, Tr.Vol.V at Pl.'s Ex. 102; ROA, Doc. 1312, Tr.Vol.VII at Def.'s Exs. 88-89.

[31] ROA, Doc. 1307, Tr.Vol.II at 363:21-368:1, 404:5-405:22; ROA, Doc. 1310, Tr.Vol.V at Pl.'s Exs. 103-104; ROA, Doc. 1312, Tr.Vol.VII at Def.'s Exs. 90-91.

[32] ROA, pp.7, 19-22, Pl.'s Pet. at 1, 13-16.

[33] See ROA p.317, Decision on Mot. to Reconsider & Mot. to Clarify Scheduling Order at 1.

[34] ROA, Doc. 1307, Tr.Vol.II at 222:23-226:3, 246:3-248:20 (describing the work done on the R.B. Jordan 1 and G.S. Spencer 1 wells); ROA, Doc. 1308, Tr.Vol.III at 468:19-:25, 472:9-474:6, 478:9-:25, 480:1-486:9 (specifying the work done on five of the wells prior to testing); ROA, Doc. 1310, Tr.Vol.V, Pl.'s Exs. 91-94, 96; Def.'s Exs. 68-70, 72-73.

[35] ROA, Doc. 1306, Tr.Vol.I at 120:24-122:4.

[36] ROA, Doc. 1308, Tr.Vol.III at 487:8-:20.

[37] Id. at 646:2-:4, 652:21-:22, 655:12-:15, 673:22-677:2.

[38] ROA, Doc. 1307, Tr.Vol.II at 373:2-:5.

[39] ROA, Doc. 1308, Tr.Vol.III at 722:5-:10 ("Mr. Bo Hall sat in that chair as did Steve Galmor sitting in that chair and both tell you that I can produce these wells profitably. Both sides agree on that. That means those wells are capable of being operated at a profit sufficient to satisfy the habendum clause of all the oil and gas leases."); ROA, p.1304, Decision on the Merits at 2 ("[P]laintiff did discuss the proximity of the wells to his other producing interests. That suggested to me he thought the wells could be producing in paying quantities for him.").

[40] ROA, p.1303, Decision on the Merits at 1.

[41] Id., p.1304, Decision on the Merits at 2 (quoting Pack, 1994 OK 23, Â¶ 21, 869 P.2d at 329).

[42] Id., p.1303, Decision on the Merits at 1 (quoting James Energy Co., 1992 OK 117, Â¶Â¶ 17-18, 847 P.2d at 338).

[43] Id., p.1305, Decision on the Merits at 3.

[44] Smith v. Marshall Oil Corp., 2004 OK 10, Â¶ 8, 85 P.3d 830, 833; Hininger v. Kaiser, 1987 OK 26, Â¶ 10, 738 P.2d 137, 141; Cotner v. Warren, 1958 OK 208, Â¶ 5, 330 P.2d 217, 219; Henry v. Clay, 1954 OK 170, Â¶ 12, 274 P.2d 545, 548.

[45] Smith, 2004 OK 10, Â¶ 8, 85 P.3d at 833; Hamilton v. Amwar Petroleum Co., 1989 OK 15, Â¶ 6, 769 P.2d 146, 147; Tenneco Oil Co. v. El Paso Nat. Gas Co., 1984 OK 52, Â¶ 35, 687 P.2d 1049, 1055; Cotner, 1958 OK 208, Â¶ 5, 330 P.2d at 219.

[46] Briggs v. Sarkeys, Inc., 1966 OK 168, Â¶ 29, 418 P.2d 620, 624 (citing Nelson v. Daugherty, 1960 OK 205, 357 P.2d 425).

[47] Childers v. Childers, 2016 OK 95, Â¶ 18, 382 P.3d 1020, 1024; White v. Adoption of Baby Boy D., 2000 OK 44, Â¶ 36, 10 P.3d 212, 220 (quoting Perry v. Perry, 1965 OK 160, Â¶ 5, 408 P.2d 285, 287; In re H.M., 1998 OK CIV APP 176, Â¶ 12, 970 P.2d 1190, 1192-93); Hitt v. Hitt, 1953 OK 391, Â¶ 0, 258 P.2d 599, 599.

[48] State ex rel. Dep't of Human Servs. v. Baggett, 1999 OK 68, Â¶ 4, 990 P.2d 235, 238; accord Kluver v. Weatherford Hosp. Auth., 1993 OK 85, Â¶ 14, 859 P.2d 1081, 1084.

[49] Standing may be assessed at any point during the judicial process, and may be raised by this Court sua sponte. J.P. Morgan Chase Bank Nat'l Ass'n v. Eldridge, 2012 OK 24, Â¶ 7, 273 P.3d 62, 65 (quoting Hendrick v. Walters, 1993 OK 162, Â¶ 4, 865 P.2d 1232, 1234; In re Estate of Doan, 1986 OK 15, Â¶ 7, 727 P.2d 574, 576)

[50] See supra note 4 and accompanying text.

[51] See supra note 23 and accompanying text.

[52] See ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 18, 41, 62.

[53] Id. at Pl.'s Exs. 4-8, 10-11, 55-57; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs.44-46, 52-56, 58, 65.

[54] ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Ex. 9; ROA Doc. 1311, Tr.Vol.VI at Def.'s Ex. 64.

[55] ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 21-27, 65-68.

[56] Compare ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 12-17, 58-61 (exclusively covering lands in the NW/4 and E/2 of 13-08N-23W and in the NE/4 of 16-08N-22W), and ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 47-50, 57, 59-63 (same), with ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 21-27, 65-68 (covering the same lands, and more).

[57] See Toxic Waste Impact Grp., Inc. v. Leavitt, 1994 OK 148, Â¶ 8, 890 P.2d 906, 910-11 (providing that a party must prove standing by demonstrating that, among other things, he has "suffered an 'injury in fact' -- an invasion of a legally-protected interest" (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992))).

[58] Bixler v. Lamar Exploration Co., 1987 OK 15, Â¶ 6, 733 P.2d 410, 412; Hoyt v. Cont'l Oil Co., 1980 OK 1, Â¶ 11, 606 P.2d 560, 564.

[59] Black's Law Dictionary 716 (7th ed. 1999) (defining "habendum clause" as "[a]n oil-and-gas lease provision that defines the lease's primary term and that usu. extends the lease for a secondary term of indefinite duration as long as oil, gas, or other minerals are being produced"); see also Stewart v. Amerada Hess Corp., 1979 OK 145, Â¶ 11, 604 P.2d 854, 858 ("The 'thereafter' clause . . . is to be regarded as fixing the life of a lease . . . ."); 2 Eugene Kuntz, A Treatise on the Law of Oil and Gas Â§ 26.1, at 318 (1989) ("The purpose of the habendum clause in an oil and gas lease is to describe the duration of the interest granted.").

[60] See, e.g., Smith, 2004 OK 10, Â¶ 9, 85 P.3d at 833; Pack, 1994 OK 23, Â¶ 8, 869 P.2d at 328; Barby v. Singer, 1982 OK 49, Â¶ 4, 648 P.2d 14, 16; State ex rel. Comm'rs of the Land Office v. Amoco Prod. Co., 1982 OK 14, Â¶ 6, 645 P.2d 468, 470; Mason v. Ladd Petroleum, 1981 OK 73, Â¶ 3, 630 P.2d 1283, 1284; Stewart, 1979 OK 145, Â¶ 5, 604 P.2d at 857; State ex rel. Comm'rs of the Land Office v. Carter Oil Co. of W. Va., 1958 OK 289, Â¶Â¶ 37-47, 336 P.2d 1086, 1094-96; McVicker v. Horn, Robinson & Nathan, 1958 OK 49, Â¶Â¶ 5-6, 322 P.2d 410, 412-14; Henry, 1954 OK 170, Â¶ 6, 274 P.2d at 546; Gypsy Oil Co. v. Marsh, 1926 OK 246, Â¶ 18, 248 P. 329, 333. Our reason for defining "produced" in this way was to secure development of the property for the mutual benefit of both lessor and lessee, thereby giving effect to the purpose of a mineral-interest lease and to the mutual intent of its parties. Gypsy Oil Co., 1926 OK 246, Â¶ 18, 248 P. at 333; 2 Kuntz, supra note 59, Â§ 26.5, at 335.

[61] Smith, 2004 OK 10, Â¶ 9, 85 P.3d at 833 (quoting Hininger, 1987 OK 26, Â¶ 6, 738 P.2d at 140, and citing Stewart, 1979 OK 145, Â¶ 6, 604 P.2d at 857); accord Mason, 1981 OK 73, Â¶ 3, 630 P.2d at 1284; Henry, 1954 OK 170, Â¶ 6, 274 P.2d at 546; Gypsy Oil Co., 1926 OK 246, Â¶ 18, 248 P. at 333.

[62] Pack, 1994 OK 23, Â¶Â¶ 5 n.1, 8-12, 869 P.2d at 325 n.1, 326-27 ("The term 'produced' as used in the lease clauses means 'capable of producing in paying quantities.'"); James Energy Co., 1992 OK 117, Â¶ 19, 847 P.2d at 338-39; Bixler, 1987 OK 15, Â¶ 6, 733 P.2d at 412 (recognizing that a lease can be held under the habendum clause by virtue of a shut-in gas well that is capable of producing in paying quantities); Amoco Prod. Co., 1982 OK 14, Â¶ 6, 645 P.2d at 470 ("[Cap]ability to produce a shut-in gas well will hold a lease as long as the operator seeks a market with due diligence." (citing McVicker, 1958 OK 49, 322 P.2d 410)); Carter Oil Co. of W. Va., 1958 OK 289, Â¶ 45, 336 P.2d at 1095 ("In other words in the absence of a specific clause requiring marketing within the primary term fixed in the lease, the completion of a well, as provided therein, capable of producing oil or gas in paying quantities will extend such term, provided that within a reasonable time the actual length of which must of necessity depend upon the facts and circumstances of each case, a market is obtained and oil or gas is produced and sold from such well." (emphasis added)); Henry, 1954 OK 170, Â¶ 11, 274 P.2d at 548 ("In the case of Okmulgee Supply Corporation v. Anthis, 189 Okl. 139, 114 P.2d 451, we held . . . . that the standard by which the judgment and good faith of the lessee is measured is whether the lease is producing, or by the exercise of reasonable skill and diligence could be made to produce, sufficient oil and gas to justify a reasonable and prudent operator in continuing the operation thereof. It is a poor rule that does not work both ways. Having held that the operator is under a duty to continue production if by the exercise of reasonable skill and diligence the well could be made to produce sufficient oil and gas to justify a reasonable and prudent operator in continuing the operation thereof, we believe the operator should have the right to continue production under the same circumstances." (emphasis added)).

[63] Amoco Prod. Co., 1982 OK 14, Â¶ 6, 645 P.2d at 470, quoted in Pack, 1994 OK 23, Â¶ 11, 869 P.2d at 327.

[64] Pack, 1994 OK 23, Â¶Â¶ 8-9, 869 P.2d at 326; Gard v. Kaiser, 1978 OK 110, Â¶Â¶ 17-18, 582 P.2d 1311, 1313; Carter Oil Co. of W. Va., 1958 OK 289, Â¶ 42, 336 P.2d at 1094-95; McVicker, 1958 OK 49, Â¶ 5, 322 P.2d at 412-13.

[65] Hydrocarbon Mgmt., 861 S.W.2d at 433-34.

[66] See Pet'r's Br. 23 (citing Smith v. Steckman Ridge, LP, 590 Fed. Appx. 189 (3d Cir. 2014) (applying Pennsylvania law); Maralex Res., Inc. v. Gilbreath, 76 P.3d 626 (N.M. 2003); Hupp v. Beck Energy Corp., 20 N.E.3d 732 (Ohio Ct. App. 2014)).

[67] Levin, 234 P.3d at 819.

[68] Concorde Res., 2016 OK CIV APP 37, Â¶Â¶ 45, 49, 53, 379 P.3d at 1164-65.

[69] Hall reads our case of Smith v. Marshall Oil Corp., 2004 OK 10, 85 P.3d 830, as requiring that capability be established "at all times" during the shut-in period. See, e.g., Appellant's Reply Br. 14 ("[F]or a well to be a valid and subsisting Pack well, the well must be capable of production in paying quantities at all times during the shut-in period." (emphasis added) (citing Smith, 2004 OK 10, Â¶ 13, 85 P.3d at 835)); id. at 16 ("A shut-in well must remain capable of producing in paying quantities at all times." (citing Smith, 2004 OK 10, Â¶ 13, 85 P.3d at 835)). The language Hall cites in support of his interpretation merely notes that the parties in the Pack case "stipulated that the subject wells were at all times capable of producing in paying quantities." Smith, 2004 OK 10, Â¶ 13, 85 P.3d at 835. See generally Pack, 1994 OK 23, Â¶ 12, 869 P.2d at 327. This factual observation from Pack and Smith should not be construed as creating a rule requiring the lessee to prove its well was and has been capable "at all times," and it consequently should not be construed as an inconsistency with the rule being announced here that only requires the lessee to prove its well was capable of producing in paying quantities when it was shut in.

[70] Smith, 2004 OK 10, Â¶ 9, 85 P.3d at 833; Pack, 1994 OK 23, Â¶ 8, 869 P.2d at 326. On the other hand, if the well was not in working order and was not producing in paying quantities at the instant it was shut in, the well is not being "shut in" at the time operations cease. Instead, the well is experiencing a "cessation of production." Under these circumstances, the well is not "capable" of production, and its lease will not continue under the habendum clause. Rather, the lease will be subject to forfeiture if production is not reestablished during the grace-period specified in the cessation-of-production clause, see French v. Tenneco Oil Co., 1986 OK 22, Â¶ 8, 725 P.2d 275, 277; Hoyt, 1980 OK 1, Â¶ 10, 606 P.2d at 563, or, where no such clause exists, the reasonable time period allowed by the temporary cessation doctrine, see Smith, 2004 OK 10, Â¶ 12, 85 P.3d at 834; Carter Oil Co. of W. Va., 1958 OK 289, Â¶ 44, 336 P.2d at 1095; Townsend v. Creekmore-Rooney Co., 1958 OK 265, Â¶ 6, 332 P.2d 35, 37; Cotner, 1958 OK 208, Â¶ 5, 330 P.2d at 220.

[71] E.g., Appellant's Br. 24-25; Appellant's Reply Br. 10, 12-13.

[72] See supra notes 69-70 and accompanying text. Moreover, once Hall challenged the validity of the leases, evidence of any post-litigation deterioration of the wells' condition becomes irrelevant because of the doctrine of obstruction, which permits a lessee to "suspend operations under the terms of a lease contract pending determination of a communicated assertion that the lease is no longer valid and subsisting." French, 1986 OK 22, Â¶ 5, 725 P.2d at 276 (citing Allen v. Palmer, 1948 OK 231, 209 P.2d 502; Elsey v. Wagner, 1946 OK 344, 183 P.2d 829; Simons v. McDaniel, 1932 OK 34, 7 P.2d 419); accord Hoyt, 1980 OK 1, Â¶ 4, 606 P.2d at 562; Jones v. Moore, 1959 OK 23, Â¶ 0, 338 P.2d 872, 873. Thus, unless he could prove that the wells were in need of repairs prior to the filing of his lawsuit in February 2015, Hall's attempt to invoke evidence of the wells' need for repairs in October 2015 would be barred.

[73] E.g., Appellant's Reply Br. 14-17.

[74] See id. at 16-17.

[75] See supra note 27 and accompanying text.

[76] Marion Energy apparently filed for bankruptcy just one week after the sale of assets to Galmor. See ROA, Doc. 1308, Tr.Vol.III at 719:1-:3; see also Marion Energy Inc.'s Voluntary Pet., In re Marion Energy Inc., No. 2:14-bk-31632 (Bankr. D. Utah filed Oct. 31, 2014).

[77] Steiger v. City Nat'l Bank of Tulsa, 1967 OK 41, Â¶Â¶ 22-24, 424 P.2d 69, 72.

[78] See supra note 62 and accompanying text.

[79] Hoyt, 1980 OK 1, Â¶ 10, 606 P.2d at 563; accord Pack, 1994 OK 23, Â¶ 15, 869 P.2d at 328; French, 1986 OK 22, Â¶ 8, 725 P.2d at 277 (quoting Greer v. Salmon, 479 P.2d 294, 297 (N.M. 1970)); 4 Eugene Kuntz, A Treatise on the Law of Oil and Gas Â§ 47.3(a)(3), at 103 (1990); Black's Law Dictionary, supra note 59, at 221.

[80] Smith, 2004 OK 10, Â¶ 12, 85 P.3d at 834; Stewart, 1979 OK 145, Â¶ 11, 604 P.2d at 858; Townsend, 1958 OK 265, Â¶ 6, 332 P.2d at 37; Carter Oil Co. of W. Va., 1958 OK 289, Â¶ 44, 336 P.2d at 1095; Cotner, 1958 OK 208, Â¶ 5, 330 P.2d at 220.

[81] See French, 1986 OK 22, Â¶ 8, 725 P.2d at 277; Hoyt, 1980 OK 1, Â¶ 10, 606 P.2d at 563 (citing cases from other jurisdictions).

[82] See Pack, 1994 OK 23, Â¶ 16, 869 P.2d at 328.

[83] Pack, 1994 OK 23, Â¶Â¶ 14-15, 869 P.2d at 328; accord Hoyt, 1980 OK 1, Â¶Â¶ 9-10, 606 P.2d at 563 (stating that, at least when one considers a cessation of production during the secondary term of the lease, the term "production" means "production in paying quantities" for purposes of both the habendum clause and the cessation-of-production clause). See generally 15 O.S.2011 Â§Â§ 155, 157 and the case of Panhandle Coop. Royalty Co. v. Cunningham ex rel. Estate of Jarboe, 1971 OK 63, Â¶ 15, 495 P.2d 108, 113, for the proposition that we are bound to consider all the provisions of a contract in construing the terms of a contract and to use each provision to help interpret the others.

[84] Pack, 1994 OK 23, Â¶Â¶ 14-21, 869 P.2d at 328-29; accord 4 Kuntz, supra note 79, Â§ 47.3(b), at 105-06 ("[I]f the effect of the cessation of production clause is to modify the habendum clause under the circumstances, the 'production' required for the cessation of production clause should be the same as the production required to satisfy the habendum clause, and a 'cessation' of production should be the same as a cessation for purposes of the habendum clause."). As we reasoned in the Pack case, "[a]ny other conclusion would render the habendum clause useless after the primary term expires, [which would be] a conclusion clearly not intended by the parties to the lease." Pack, 1994 OK 23, Â¶ 15, 869 P.2d at 328. If we were to decide that the term "production" as used in the cessation-of-production clause did not encompass mere capability, then after the primary term expires, the lessee would never be permitted to shut-in a well capable of production in paying quantities for a time period longer than that specified in the cessation-of-production clause (e.g., 60 days)--even where the circumstances and equities demonstrate that a reasonable lessee might be entitled to more time (such as a scenario where obtaining a market requires more than 60 days for even the most zealous lessee). "Such a result ignores the express terms of the habendum clause which provide for the lease to continue after the primary term as long as the well is capable of production in commercial quantities" and would be "a conclusion clearly not intended by the parties to the lease." Id. Also, maintaining consistency from clause to clause in our definition of "produce" reveals that the purpose of the cessation-of-production clause is merely to operate as a savings clause that only applies when production--as defined in the habendum clause--ceases. Id. Â¶ 16, 869 P.2d at 328; see also Hoyt, 1980 OK 1, Â¶ 10, 606 P.2d at 563 (referring to the cessation-of-production clause as an agreement of the parties fixing a "period of grace" (quoting Greer, 479 P.2d at 297)), quoted in French, 1986 OK 22, Â¶ 8, 725 P.2d at 277.

[85] Voiles v. Santa Fe Minerals, Inc., 1996 OK 13, Â¶ 9, 911 P.2d 1205, 1208 (noting the Pack case "explained that a sixty-day cessation of production clause requires the well to be capable of producing in paying quantities, but that a lease capable of producing in paying quantities will not terminate under that clause"); Pack, 1994 OK 23, Â¶ 21, 869 P.2d at 329 ("The cessation of production clause only requires the well be capable of producing gas in paying quantities. . . . Therefore, the lease will continue as long as the well is capable of production in paying quantities subject, of course, to any violation of any other express provisions such as the shut-in royalty clause or implied covenants such as the covenant to market."); Hoyt, 1980 OK 1, Â¶ 10, 606 P.2d at 563 (stating the inverse: "If the lessee fails to resume operations within the 60-day period provided in this clause neither the cessation of production clause or the habendum clause is satisfied and the lease terminates upon the expiration of the given time period.").

[86] Pack, 1994 OK 23, Â¶ 16, 869 P.2d at 328.

[87] Id. Â¶Â¶ 16, 21, 869 P.2d at 328-29.

[88] See, e.g., Appellant's Br. 16-17 (citing Fisher, 1991 OK CIV APP 112, Â¶Â¶ 13-18, 830 P.2d at 1386-88).

[89] Id. at 16 (citing Fisher, 1991 OK CIV APP 112, Â¶Â¶ 13-18, 830 P.2d at 1386-88).

[90] See Anadarko Petroleum Corp. v. Thompson, 94 S.W.3d 550, 557 (Tex. 2002).

[91] Fisher, 1991 OK CIV APP 112, Â¶ 18, 830 P.2d at 1388.

[92] Pack, 1994 OK 23, Â¶Â¶ 8, 15, 21, 26, 869 P.2d at 326, 328-30.

[93] Id. Â¶Â¶ 4, 24, 869 P.2d at 325, 330 (citing Gard, 1978 OK 110, Â¶ 26, 582 P.2d at 1314-15).

[94] Id. Â¶Â¶ 21, 27, 869 P.2d at 329-30.

[95] Hall notes that his trial court petition alleges "[t]he Subject Leases have expired by their own terms as there has been no well attributable to the Subject Leases, upon the Subject Lands, capable of producing in paying quantities" and does not contain the words "implied," "covenant," or "market." Appellant's Br. 12 (quoting ROA, p.20, Pet. Â¶ 19, at 14).

[96] Id. at 12-13 (citing ROA, pp.1303-1305, Decision on the Merits at 1-3).

[97] See supra Part III.B.

[98] See generally ROA, pp.1304-1305, Decision on the Merits at 2-3.

[99] Pack, 1994 OK 23, Â¶ 21, 869 P.2d at 329 ("[T]he lease[s] will continue as long as the well[s] [are] capable of production in paying quantities subject, of course, to any violation of any other express provisions such as the shut-in royalty clause[s] or implied covenants such as the covenant to market.").

[100] ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 4-8, 10-11, 55-57; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs.44-46, 52-56, 58, 65

[101] ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Ex. 11 (signed on September 20, 2007, and establishing a primary term of three years).

[102] See Broadway Clinic v. Liberty Mut. Ins. Co., 2006 OK 29, Â¶ 15, 139 P.3d 873, 877 ("In the absence of ambiguity or conflict with another enactment, our task is limited to applying a statute according to the plain meaning of the words chosen by the legislature . . . ."); Twin Hills Golf & Country Club, Inc. v. Town of Forest Park, 2005 OK 71, Â¶ 6, 123 P.3d 5, 6-7 (citing City of Durant v. Cicio, 2002 OK 52, Â¶ 13, 50 P.3d 218, 220; World Publ'g Co. v. Miller, 2001 OK 49, Â¶ 7, 32 P.3d 829, 834)); Cox v. State ex rel. Okla. Dep't of Human Servs., 2004 OK 17, Â¶ 19, 87 P.3d 607, 615 (citing Minie v. Hudson, 1997 OK 26, Â¶ 7, 934 P.2d 1082, 1086; Darnell v. Chrysler Corp., 1984 OK 57, Â¶ 5, 687 P.2d 132, 134)); Rath v. LaFon, 1967 OK 52, Â¶ 4, 431 P.2d 312, 314 ("There is no occasion for this court to search for the 'intent' of the Legislature in designating the location of the court in question. . . . 'The presumption is that the legislature expressed its intent in a statute and that it intended what is expressed.'" (quoting Hamrick v. George, 1962 OK 247, Â¶ 7, 378 P.2d 324, 326)).

[103] Cox, 2004 OK 17, Â¶ 19, 87 P.3d at 615 (citing McSorley v. Hertz Corp., 1994 OK 120, Â¶ 6, 885 P.2d 1343, 1346; Smicklas v. Spitz, 1992 OK 145, Â¶ 8, 846 P.2d 362, 366; Oglesby v. Liberty Mut. Ins. Co., 1992 OK 61, Â¶ 8, 832 P.2d 834, 839-40); City of Midwest City v. Harris, 1977 OK 7, Â¶ 6, 561 P.2d 1357, 1358.

[104] Cox, 2004 OK 17, Â¶ 19, 87 P.3d at 615 (citing Haney v. State, 1993 OK 41, Â¶ 5, 850 P.2d 1087, 1089; Pub. Serv. Co. of Okla. v. State ex rel. Corp. Comm'n, 1992 OK 153, Â¶ 8, 842 P.2d 750, 752).

[105] 52 O.S.Supp.2017 Â§ 87.1(b); Act of May 25, 1977, ch. 77, Â§ 1, 1977 O.S.L. 145, 146.

[106] Okla. Nat. Gas Co. v. Long, 1965 OK 153, Â¶Â¶ 12-15, 406 P.2d 499, 502-03; Layton v. Pan Am. Petroleum Corp., 1963 OK 140, Â¶ 0, 383 P.2d 624, 625; Carter Oil Co. of W. Va., 1958 OK 289, Â¶Â¶ 0, 33, 336 P.2d at 1088, 1093; Kunc v. Harper-Turner Oil Co., 1956 OK 118, Â¶ 29, 297 P.2d 371, 376; Godfrey v. McArthur, 1939 OK 335, Â¶ 14, 96 P.2d 322, 325; see also Walker & Withrow, Inc. v. Haley, 1982 OK 107, Â¶ 5, 653 P.2d 191, 193 ("Since Â§ 87.1 did not apply retroactively, the 1958 lease is still in force because there is a producing well upon lands located within the same well spacing unit."); Wickham v. Gulf Oil Corp., 1981 OK 8, Â¶ 14, 623 P.2d 613, 616 (stating "the previous law [provided] that the production of oil and gas in commercial quantities from any part of the leased premises during the primary term extended the lease not only as to the acreage committed to the drilling and spacing unit but also as to the lands lying outside of the unit area."); Siniard v. Davis, 1984 OK CIV APP 13, Â¶ 12, 678 P.2d 1197, 1200-01 ("Prior to the enactment of the statutory Pugh clause . . . , production from the unit satisfied the habendum clause of the lease as to the part of the leased premises included in the unit and also as to the part of the leased premises outside of the unit."); cf. Gypsy Oil Co. v. Cover, 1920 OK 94, Â¶Â¶ 0, 18, 189 P. 540, 540, 544 (citing Pierce Oil Corp. v. Schacht, 1919 OK 142, 181 P. 731).

[107] Kardokus v. Walsh, 1990 OK 39, Â¶ 5, 797 P.2d 322, 324; Rein v. Humble Oil & Ref'g Co., 1965 OK 51, Â¶ 13, 400 P.2d 800, 803; Layton, 1963 OK 140, Â¶Â¶ 4-6, 383 P.2d at 625-26; Carter Oil Co. of W. Va., 1958 OK 289, Â¶ 33, 336 P.2d at 1093; Kunc, 1956 OK 118, Â¶ 29, 297 P.2d at 376.

[108] Eugene Kuntz, Statutory Well Spacing and Drilling Units, 31 Okla. L. Rev. 344, 352 (1978).

[109] 52 O.S.1971 Â§ 87.1(d) ("In the event a producing well or wells are completed upon a unit where there are . . . two (2) or more separately owned tracts, any royalty owner or group of royalty owners holding the royalty interest under a separately owned tract included in such spacing unit shall share in the one-eighth (1/8) of all production from the well or wells drilled within the unit . . . in the proportion that the acreage of their separately owned tract or interest bears to the entire acreage of the unit.").

[110] See supra note 106 and accompanying text.

[111] See supra note 107 and accompanying text.

[112] Wickham, 1981 OK 8, Â¶ 14, 623 P.2d at 616 (quoting Kuntz, supra note 108, at 344); see also Kuntz, supra note 108, at 353-54.

[113] Â¶ 14, 623 P.2d at 616.

[114] Â¶ 15, 678 P.2d at 1200 (emphasis added).

[115] Report of the Oil & Gas Appellate Referee at 12, In re Application of Sandridge Exploration & Prod., L.L.C. for Drilling & Spacing Units, No. CD-201101938 (Okla. Corp. Comm'n filed Jan. 25, 2012).

[116] Appellee's Answer Br. 25.

[117] See supra Â¶ 49.

[118] Martin ex rel. S.M. v. Phillips, 2018 OK 56, Â¶ 9, --- P.3d ---; Udall v. Udall, 1980 OK 99, Â¶ 11, 613 P.2d 742, 745 ("Exceptions should not be read into a statute which are not made by the legislative body." (citing Seventeen Hundred Peoria, Inc. v. City of Tulsa, 1966 OK 155, 422 P.2d 840)).

[119] The text of Article II, Section 23 reads: "No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes, in such manner as may be prescribed by law."

[120] Kuntz, supra note 108, at 356 (emphasis added).

[121] Wickham, 1981 OK 8, Â¶ 15, 623 P.2d at 616.

[122] Id. Â¶Â¶ 14-15, 623 P.2d at 616.

[123] Id. Â¶ 15, 623 P.2d at 616.

[124] See Appellee's Answer Br. 26-27.

[125] Even Professor Kuntz failed to observe any problem under the takings clauses with prospective application of section 87.1(b): "It is submitted that the amendment would be unconstitutional if applied to an existing lease, regardless of whether it is held by production from a unit and that it must therefore be construed to apply only to leases granted after the effective date of the amendment." Kuntz, supra note 108, at 356 (emphasis added).

[126] Texaco, Inc. v. Short, 454 U.S. 516, 527 (1982).

[127] Croxton v. State, 1939 OK 504, Â¶ 22, 97 P.2d 11, 18 ("Police regulations which are reasonable are not inhibited by the Constitution, though invading its letter, since the exercise of police power is so essential to the public welfare that it is presumed that such exercise within reasonable limits was not intended to be prohibited, but, on the contrary, guaranteed by the general declared purpose of civil government and the manifest purpose of the Constitution." (quoting State v. Redmon, 114 N.W. 137, 137 (Wis. 1907))); cf. Palazzolo, 533 U.S. at 627 ("[A] prospective enactment, such as a new zoning ordinance, can limit the value of land without effecting a taking because it can be understood as reasonable by all concerned." (emphasis added)).

[128] Okla. Const. art. V, Â§ 57.

[129] Id.

[130] Compare Senate Journal, 36th Leg., 1st Reg. Sess. 684-85 (Okla. 1977) (showing the Conference Committee's amendments, including the new language for subpart (b) and the addition of "imposing certain time limitations" to the bill's title), with id. at 42 (showing the original title of the bill, which did not contain the phrase "imposing certain time limitations"). See generally Kuntz, supra note 108, at 354 (showing Professor Kuntz's conclusion that this phrase must be what the Legislature intended for describing the contents of subpart (b): "The portion of the title which is not clearly descriptive of some other provision of the act, and which apparently was intended to describe this important new provision, is the phrase 'imposing certain time limitations.'").

[131] Stewart v. Okla. Tax Comm'n, 1946 OK 132, Â¶ 10, 168 P.2d 125, 128 (citing Lowden v. Luther, 1941 OK 412, 120 P.2d 359); Lowden v. Washita Cty. Excise Bd., 1941 OK 153, Â¶ 10, 113 P.2d 370, 371 (citing Gibson Prods. Co. v. Murphy, 1940 OK 100, 100 P.2d 453; Chi., Rock Island & Pac. Ry. Co. v. Excise Bd. of Stephens Cty., 934 OK 392, 34 P.2d 274; Dabney v. Hooker, 1926 OK 751, 249 P. 381; State ex rel. City of Durant v. Bonner, 1922 OK 130, 208 P. 825; Okla. City Land & Dev. Co. v. Hare, 1917 OK 389, 168 P. 407; In re Comm'rs of Ctys. Comprising 7th Judicial Dist., 1908 OK 207, 98 P. 557).

[132] Lowden, 1941 OK 153, Â¶ 13, 113 P.2d at 372 (quoting Steinkamp v. Bd. of Comm'rs of Decatur Cty., 200 N.E. 211, 211 (Ind. 1936)).

[133] Stewart, 1946 OK 132, Â¶ 10, 168 P.2d at 128 (citing Nat'l Mut. Cas. Co. v. Briscoe, 1940 OK 487, 109 P.2d 1088); accord In re Initiative Petition No. 347, State Question No. 639, 1991 OK 55, Â¶ 17, 813 P.2d 1019, 1027; Cont'l Oil Co. v. State Bd. of Equalization, 1972 OK 29, Â¶ 5, 494 P.2d 645, 647; Lowden, 1941 OK 412, Â¶ 8, 120 P.2d at 361.

[134] Appellee's Answer Br. 27.

[135] See supra Â¶ 59 (stating that the statutory Pugh clause "simply places a time limitation upon the lessee's ability to hold a lease on Pugh Clause Lands without drilling a well thereon" (emphasis added)); cf. supra Â¶ 43 (observing that "Galmor's predecessors never drilled wells upon the Pugh Clause Lands within the time limitations established by section 87.1(b)" (emphasis added)).

[136] See ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 12-17, 58-61; ROA, Doc. 1311, Tr.Vol.VI at Def.'s Exs. 47-50, 57, 59-63.

[137] See ROA, Doc. 1309, Tr.Vol.IV at Pl.'s Exs. 12-17, 58-61.

[138] See id. at Pl.'s Exs. 16, 60.

[139] See id. at Pl.'s Ex. 61 (signed on January 10, 2008, and establishing a primary term of three years).

[140] See Pack, 1994 OK 23, Â¶ 8, 869 P.2d at 326 ("[I]n order to extend the fixed term of ten years 'and acquire a limited estate in the land covered thereby the lessee must have found oil or gas upon the premises in paying quantities by completing a well thereon prior to the expiration of such fixed term.'" (quoting Carter Oil Co. of W. Va., 1958 OK 289, Â¶ 36, 336 P.2d at 1094)); Roach v. Junction Oil & Gas Co., 1919 OK 103, Â¶ 5, 179 P. 934, 936 ("It was a condition precedent to the right of defendant to continue operations beyond the period of five years that oil and gas or either of them should be found upon the premises in paying quantities . . . ."); Curtis v. Harris, 1919 OK 305, Â¶ 4, 184 P. 574, 575 ("Under the express and unequivocal terms of the lease, the rights of both parties were to terminate January 8, 1917, if a well was not completed . . . . The lease terminated by its terms on the 8th of January, no well having been drilled . . . .").